1   Witold J. Walczak (*pro hac vice* to be filed)   Susan M. Lin (*pro hac vice* to be filed)
    Stephen A. Loney, Jr. (*pro hac vice* to be filed)   Jonathan H. Feinberg (*pro hac vice* to be filed)
2   Ari Shapell (*pro hac vice* to be filed)   Grace Harris (*pro hac vice* to be filed)
    Keith Armstrong (*pro hac vice* to be filed)   KAIRYS, RUDOVSKY, MESSING, FEINBERG
3   AMERICAN CIVIL LIBERTIES UNION OF   & LIN, LLP
    PENNSYLVANIA   718 Arch St. Suite 501 South
4   P.O. Box 60173   Philadelphia, PA 19106
    Philadelphia, PA 19102   Telephone: (215) 925-4400
5   Telephone: (215) 592-1513   slin@krlawphila.com
    vwalczak@aclupa.org   jfeinberg@krlawphila.com
6   sloney@aclupa.org   gharris@krlawphila.com
7   ashapell@aclupa.org
    karmstrong@aclupa.org   Seth Kreimer (*pro hac vice* to be filed)
8                                                         3501 Sansom St.
9   Jacob Snow (CA Bar No. 270988)   Philadelphia, PA 19104
    Matthew T. Cagle (CA Bar No. 286101)   Telephone: (215) 898-7447
10  AMERICAN CIVIL LIBERTIES UNION   skreimer@law.upenn.edu
    FOUNDATION OF NORTHERN
11  CALIFORNIA, INC.   Caitlin Barry (*pro hac vice* to be filed)
12  39 Drumm Street   Villanova University
    San Francisco, CA 94111   Charles Widger School of Law
13  Telephone: (415) 621-2493   299 N. Spring Mill Rd.
    jsnow@aclunc.org   Telephone: (610) 519-3216
14  mcagle@aclunc.org   caitlin.barry@law.villanova.edu
15
16  *Attorneys for Movant*

17                    **UNITED STATES DISTRICT COURT**

18                    **NORTHERN DISTRICT OF CALIFORNIA**

19  *In the Matter of Summons Numbers HSI-PH-2025-*   Misc. Case No.:
    *082814-001 and HSI-PH-2025-082819-001:*
20                                                          **NOTICE OF MOTION TO QUASH**
    J. DOE,                                                 **AND MOTION TO QUASH**
21                                                          **SUMMONSES; MEMORANDUM**
                         Movant,                            **OF POINTS AND AUTHORITIES**
22
23          v.                                              Date: To be set by the Court
                                                            Time: To be set by the Court
24  THE UNITED STATES DEPARTMENT OF                         Courtroom: To be set by the Court
    HOMELAND SECURITY,
25
                         Respondent.
26

27

28

---

**NOTICE OF MOTION AND MOTION TO QUASH**

**PLEASE TAKE NOTICE** that pursuant to Rules 45(d)(3) and 81(a)(5) of the Federal Rules of Civil Procedure, as soon as this matter may be heard by the United State District Court for the Northern District of California, J. Doe will, and hereby does, move to quash two administrative Summonses issued to Meta Platforms, Inc., dated September 11, 2025, by the Department of Homeland Security, designated as Summons Numbers HSI-PH-2025-082819-001 and HSI-PH-2025-082814-001.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of J. Doe and all exhibits attached thereto, all pleadings and papers on file in this action, and such other matters as the Court may consider.

Dated: October 16, 2025                    Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF NORTHERN CALIFORNIA, INC.

*/s/ Jacob Snow*
Jacob Snow (SBN 270988)
Matthew T. Cagle (SBN 286101)

*Attorneys for Movant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    I.    Immigration Enforcement Activity in Montgomery County ............................... 4

    II.   The "MontCo Community Watch" Facebook and Instagram Accounts ...................... 6

    III.  The Summonses and Meta's Response ........................................................ 6

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT ................................................................................................................. 8

    I.    The Summonses Should Be Quashed Because They Exceed DHS's Statutory Authority ............. 8

    II.   The Summonses Should Be Quashed Because They Infringe Movant's First Amendment Rights ......... 10

        A.   *The First Amendment Protects Movant's Right to Criticize the Government—and To Do So Anonymously* ... 10

        B.   *The First Amendment Protects the Right to Record Law Enforcement and Publish That Recording* ... 11

        C.   *The First Amendment Protects the Right to Publish the Identity of Law Enforcement Agents* ... 12

        D.   *The First Amendment Protect Movant's Right to Interact with Online Content, Curate a Feed for Followers, and Associate with Others* ... 14

        E.   *Given the First Amendment Rights at Stake, the Summonses Fail to Meet the High Threshold for Compelling Disclosure of Movant's Identity* ... 15

    III.  The Court Should Decide This Motion as Soon as Possible ....................... 18

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases** ............................................................................................................. **Pages(s)**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ............................................................. 11

*Alvarado v. KOB-TV, L.L.C.,*
  493 F.3d 1210 (10th Cir. 2007) ..................................................... 13, 16

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ............................................................. 16, 17, 18

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011) ......................................................................... 10

*Art of Living Found. v. Does 1–10,*
  2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ....................................... 7

*Askins v. Dep't of Homeland Sec.,*
  899 F.3d 1035 (9th Cir. 2018) ......................................................... 11

*Baird v. State Bar of Ariz.,*
  401 U.S. 1 (1971) ............................................................................ 17

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ................................................................... 12, 13

*Bates v. City of Little Rock,*
  361 U.S. 516 (1960) ......................................................................... 15

*Bernal v. Sac. Cnty. Sheriff's Dep't,*
  73 F.4th 678 (9th Cir. 2023) ........................................................... 11

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) ......................................................................... 16

*Brayshaw v. City of Tallahassee,*
  709 F. Supp. 2d 1244 (N.D. Fla. 2010) ................................... 12, 13, 16

*Brock v. Local 375, Plumbers Int'l Union,*
  860 F.2d 346 (9th Cir. 1988) ........................................................... 17

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ............................................................................ 10

*Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.,*
  983 F.2d 631 (5th Cir. 1993) ............................................................. 7

*Bursey v. United States,*
  466 F.2d 1059 (9th Cir. 1972) ................................................. 7, 15, 17

*Butterworth v. Smith,*
  494 U.S. 624 (1990) ......................................................................... 11

*City of Houston v. Hill,*
   482 U.S. 451 (1987) ................................................................................................ 11

*Cox Broad. Corp. v. Cohn,*
   420 U.S. 469 (1975) ................................................................................................ 12

*Dendrite Int'l Inc. v. Doe,*
   342 N. J. Super. 134 (App. Div. 2001) ............................................................. 7, 17

*Doe v. 2TheMart.com Inc.,*
   140 F. Supp. 2d 1088 (W.D. Wash. 2001) ............................................................ 11

*Doe v. Cahill,*
   884 A.2d 451 (Del. 2005) ........................................................................................ 7

*Doe v. S.E.C., No. C,*
   11-80209 CRB, 2011 WL 5600513 n.3 (N.D. Cal. Nov. 17, 2011) ...................... 17

*Does I thru XXIII v. Adv. Textile Corp.,*
   214 F.3d 1058 (9th Cir. 2000) ............................................................................... 19

*Enterline v. Pocono Medical Center,*
   751 F.Supp.2d 782 (M.D. Pa. 2008) ....................................................................... 7

*Fields v. City of Phila.,*
   862 F.3d 353 (3rd Cir. 2017) ............................................................................ 11, 12

*Flynn v. Cable News Network,*
   621 F. Supp. 3d 432 (S.D.N.Y. 2022) ................................................................... 14

*Fordyce v. City of Seattle,*
   55 F.3d 436 (9th Cir. 1995) ................................................................................... 11

*Four Navy Seals v. Associated Press,*
   413 F. Supp. 2d 1136 (S.D. Cal 2005) .................................................................. 13

*Gibson v. Fla. Legislative Investigation Comm.,*
   372 U.S. 539 (1963) ........................................................................................ *passim*

*Glik v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011) .................................................................................... 12

*Hell's Angels Motorcycle Corp. v. Cnty. of Monterey,*
   89 F. Supp. 2d 1144 (N.D. Cal. 2000) ............................................................. 18, 19

*Highfields Cap. Mgmt. v. Doe,*
   385 F. Supp. 2d 969 (N.D. Cal. 2005) ........................................................ 7, 15, 17

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston,*
   *Inc.*, 515 U.S. 557 (1995) ...................................................................................... 14

*In re DMCA § 512(h) Subpoena to Twitter, Inc.,*
   608 F. Supp. 3d ..................................................................................................... 17

*In re PGS Home Co. Ltd,*
   No. 19-MC-80139-JCS, 2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) .............. 17

*In re Sealed Case (Admin. Subpoena),*
   42 F.3d 1412 (D.C. Cir. 1994) ................................................................ 8

*Index Newspapers LLC v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020)................................................................ 11

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31,*
   585 U.S. 878 (2018) ................................................................ 10

*Johnson v. Bay Area Rapid Transit Dist.,*
   724 F.3d 1159 (9th Cir. 2013) ................................................................ 16

*Knox v. Sw. Airlines,*
   124 F.3d 1103 (9th Cir. 1997) ................................................................ 12

*Malibu Media, LLC v. John Does 1-16,*
   902 F.Supp.2d 690 (E.D. Pa.  2012) ................................................................ 7

*McIntyre v. Ohio Elections Comm'n,*
   514 U.S. 334 (1995) ................................................................ 3, 11

*Mills v. Alabama,*
   384 U.S. 214 (1966) ................................................................ 11

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................................................ 14

*Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp.,*
   No. 12-CV-10803, 2014 WL 10319321 (E.D. Mich. July 2, 2014) ................................................................ 17

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................................................ 11

*NAACP v. Alabama ex rel. Patterson,*
   357 U. S. 449 (1958) ................................................................ 16, 18

*Naveed v. City of San Jose,*
   Case No. 15-cv-05298-PSG, 2016 WL 2957147 (N.D. Cal. May 23, 2016) ................................................................ 11

*Noble-Perez v. Robinson,*
   Case No. 8:22-cv-00037-JVS(JDEx), 2023 WL 6194265 (C.D. Cal. Aug. 16, 2023) ................................................................ 12

*Noem v. Vasquez Perdomo,*
   No. 25A169, 2025 WL 2585637 (Sept. 8, 2025) ................................................................ 3

*Oklahoma Publ'g Co. v. Dist. Ct.,*
   430 U.S. 308 (1977) ................................................................ 12

*Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.,*
   475 U.S. 1 (1986) ................................................................ 14

*Packingham v. North Carolina,*
   582 U.S. 98 (2017) ................................................................ 11

*Pubius v. Boyer–Vine.,*
   237 F. Supp. 3d 997 (E.D. Cal 2017) ................................................................ 12, 13

NOTICE OF MOTION AND MOTION TO QUASH SUMMONSES
Misc. Case No._____

iv

*Rancho Publ'ns v. Superior Court*,
    68 Cal. App. 4th 1538 (1999) ........................................................................... 19

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................................ 11

*Roth v. United States*,
    354 U.S. 476 (1957) ........................................................................................ 10

*Sharpe v. Winterville Police Dep't*,
    59 F.4th 674 (4th Cir. 2023) ........................................................................... 12

*Sheehan v. Gregoire*,
    272 F. Supp. 2d 1135 (W.D. Wash. 2003) ............................................ 12, 13, 16

*Sinclair v. TubeSockTedD*,
    596 F. Supp. 2d 128 (D.D.C. 2009) ................................................................. 17

*Smith v. Daily Mail Pub. Co.*,
    443 U.S. 97 (1979) .................................................................................... 12, 13

*Turner Broad. Sys., Inc. v. FCC*,
    520 U.S. 180 (1997) ........................................................................................ 14

*United States v. Rumely*,
    345 U.S. 41 (1953) ............................................................................................ 7

*United States v. Tan*,
    16 F.4th 1346 (9th Cir. 2021) ............................................................................ 8

*Virginia v. Black*,
    538 U.S. 343 (2003) ........................................................................................ 16

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................................ 10

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ...................................................................................... 8

**Statutes ............................................................................................ Pages(s)**

18 U.S.C. § 2702 ................................................................................................. 2

19 U.S.C. § 1508 ............................................................................................ 9, 10

19 U.S.C. § 1509 .......................................................................................... *passim*

**Rules ................................................................................................. Pages(s)**

Fed. R. Civ. P. 45(3)(A) .................................................................................. 1, 7

Fed. R. Civ. P. 81(a)(5) .................................................................................. 2, 1

**Other Authorities ............................................................................... Page(s)**

Case 3:25-mc-80325    Document 1    Filed 10/16/25    Page 8 of 29

Amanda Holpuch, *Reporter Is Detained by ICE After Reporting on Immigration Protest*, New York Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/us/journalist-arrested-ice-georgia-mario-guevara.html ............................................................................................................................ 3

*Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement*, Department of Homeland Security (July 11, 2025), https://perma.cc/W52R-48X ............................. 19

Ben Makuch, *US Free-Speech Rights Shredded Despite Trump Vow to be First-Amendment Champion*, The Guardian (Jun. 19, 2025), https://perma.cc/F3PW-6JXK ..................................................... 3

Dan Rosenzweig-Ziff, *How a Georgetown Scholar Went from 'Quiet' Researcher to Detainee*, Wash. Post (May 8, 2025), https://www.washingtonpost.com/education/2025/05/08/georgetown-scholar-badar-khan-suri-camera-middle-east-forum/ .......................................................................................... 3

Elena Eisenstadt, *ICE is wearing masks while making arrests across Pennsylvania. Some state lawmakers want to ban them from covering their faces,* The Philadelphia Inquirer (Jul. 23, 2025), https://www.inquirer.com/news/pennsylvania/ice-masks-arrests-philly-bill-ban-20250723.html ......... 5

Elizabeth Weill-Greenberg, *DHS Says Filming, Posting Videos of ICE Agents Is "Doxxing," Vows Prosecutions*, Truthout (Sep. 10, 2025), https://perma.cc/HAA7-HMZQ ............................................. 3

Elyse Wechterman, *Opinion: I was there when ICE stormed Gigante. I can attest to the raid's traumatic aftermath*, The Philadelphia Inquirer (Aug. 22, 2025), https://www.inquirer.com/opinion/commentary/immigration-gigante-ice-raid-norristown-moshannon-detention-20250822.html ........................................................................................................................... 5

Emily Neil, *Norristown immigrant community, allies shaken after ICE raid at supermarket*, WHYY (Jul. 18, 2025), https://whyy.org/articles/norristown-immigrants-ice-raid-supermarket/ ..................... 5

Emily Neil, *Norristown immigrants fearful after ICE raids; Montco officials voice support*, WHYY (June 5, 2025) https://whyy.org/articles/norristown-montgomery-county-ice-immigrants-fearful/ ....... 4

Forbes Breaking News, *Kristi Noem Caims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*,  (YouTube, July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ............................................................. 3, 19

Jay Capian King, *The Detention of Mahmoud Khalil is a Flagrant Assault on Free Speech*, New Yorker (Mar. 14, 2025), https://perma.cc/JT7T-5SAP ................................................................................... 3

Jeff Gammage and Katie Bernard, *ICE arrests nearly 20 in Norristown as immigrant community calls on Montco commissioners to act*, The Philadelphia Inquirer (June 4, 2025), https://www.inquirer.com/news/ice-arrests-norristown-montgomery-deport-20250604.html ........... 4, 5

Jeff Gammage and Katie Bernard, *Undocumented mother faces deportation after Montco officials turn her over to ICE. County policy likely to be reviewed*, The Philadelphia Inquirer (June 10, 2025) https://www.inquirer.com/news/pennsylvania/ice-detainer-pennsylvania-montgomery-county-20250610.html ........................................................................................................................................ 5

Jeff Gammage, *Montco bars county employees from sharing information with ICE without a legal order*, The Philadelphia Inquirer (June 18, 2025), https://www.inquirer.com/news/pennsylvania/montgomery-county-immigration-status-requests-20250618.html ........................................................................................................................................ 5

Jesse Bunch, *They planned to marry this year. An ICE arrest near the King of Prussia mall changed everything*, The Philadelphia Inquirer (Aug. 17, 2025), https://www.inquirer.com/news/immigration-arrest-andres-morales-king-of-prussia-20250817.html ................................................................... 5

Justin Heinze, *'This Is Terror': ICE Makes String of Arrests In Norristown*, Patch (June 5, 2025),
https://patch.com/pennsylvania/norristown/terror-ice-makes-string-arrests-norristown ...................... 4

"Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509."
Available at https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-18-18-nov17.pdf .......... 2

Matthew Cunningham-Cook, *DHS Says Masking and Posting Videos of ICE Agents is "Violence,"*
Exposed by the Center for Media and Democracy (Sep. 9, 2025),
https://perma.cc/2C94-HU7M ......................................................................................................... 3, 19

Mohsen Mahdawi*, I was Detained for My Beliefs. Who Will Be Next?*, N.Y. Times Op. Ed.
(May 2, 2025), https://www.nytimes.com/2025/05/02/opinion/mohsen-mahdawi-ice-detention.html .. 3

NBC10 Philadelphia, *ICE arrests 14 people at grocery store in West Norriton Township, Pennsylvania*,
YouTube (Jul. 16, 2025), https://www.youtube.com/watch?v=RkWoRoYGI9M .................................. 5

**INTRODUCTION**

Movant J. Doe brings this action to protect their First Amendment rights to anonymously create, curate, and share content on a Facebook account using the name "MontCo Community Watch" and an Instagram account using the handle "@montcowatch," referring to Montgomery County, Pennsylvania.[1] Movant uses these accounts to communicate content that reflects their moral and political commitments, information about local events, and other material of interest. Movant's posts and reposts often express views critical of the government. *See* Declaration of J. Doe in Support of Motion to Quash ("Doe Decl.") ¶¶ 4-9. Others access these accounts for the same reasons. The posts and interactions are constitutionally protected as core First Amendment speech; users have constitutional rights to post and access posts anonymously.

But in reaction to this anonymous political speech, the Department of Homeland Security ("DHS") issued two administrative Summonses to Meta Platforms, Inc. ("Meta") on September 11, 2025. Doe Decl. Ex. A & B ("the Summonses"). The Summonses exclusively cite a federal statute, 19 U.S.C. § 1509, focused on customs investigations relating to merchandise. And they demand constitutionally protected information wildly outside the scope of the statutory authority—including the identity of the users associated with the "MontCo Community Watch" Facebook and Instagram accounts and IP addresses from which each account has been accessed. *Id*. The Summonses include no substantiating allegations nor any mention of a specific crime or potential customs violation that might trigger an inquiry under the cited statute. *Id*. A cursory examination of the public information in the accounts at issue makes clear that they have no nexus with the "correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States," or  the importation, export or storage of "merchandise" covered by " the customs territory of the United States" which are the authorized subjects of  § 1509.  *Id*.

Movant now files this urgent motion to protect their identity from being exposed to a government agency that is apparently targeting their "community watch" Facebook and Instagram accounts for doing

---

[1] Movant file this miscellaneous action in the Northern District of California pursuant to Fed. R. Civ. P. 45(d)(3)(A), authorizing the filing of motions to quash in the "district where compliance is required" because the Summonses were issued to Meta, purporting to require their compliance by retrieving and producing electronic data from its offices in Menlo Park, California. Rule 45 is made applicable to these administrative summonses "issued by a United States officer or agency under a federal statute" pursuant to Fed. R. Civ. P. 81(a)(5).

nothing more than exercising their rights to free speech and association. The Summonses should be quashed in their entirety. They exceed both statutory and constitutional limits—each of which provides an independent basis to prohibit the disclosure of Movant's identity to DHS.

Section 1509 in no way authorizes issuance of a subpoenas to compel social media companies to reveal the identities of unknown people interacting with the community watch social media accounts. Rather,  Section 1509 only authorizes issuance of a summons for records relevant to an investigation concerning entry of merchandise into the United States. DHS has a history of misusing  Section 1509 subpoenas to threaten speech.[2] Indeed, the Department of Homeland Security's Office of Inspector General specifically highlighted the "limit[ed] scope of third party summonses" under this provision to "'records' pertaining to prohibited ***merchandise***, or records required to be kept under section 1508, relating to the importation of merchandise." (Emphasis added).[3] There is no conceivable connection between the "MontCo Community Watch" Facebook or Instagram accounts and the importation of any merchandise, nor is there any indicated on the face of the Summonses. DHS has no authority to issue these summonses. And the material that DHS seeks is protected by the Electronic Communications Privacy Act of 1986,18 U.S.C. § 2702(a)(3) ("a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service … to any governmental entity"). Disclosure on the basis of an unauthorized administrative subpoena would violate the movants' rights under that statute.

With respect to constitutional limits, the Summonses must be quashed because they strike directly at First Amendment protections for anonymous political speech. Where, as here, a demand for disclosure implicates these constitutional interests, the government must convincingly demonstrate that the information it seeks substantially relates to an overriding and compelling government interest—a showing that DHS has not made. *See Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963). The First Amendment safeguards people's ability to criticize the government and speak out against what they see as injustice in their communities, to record law enforcement conducting their duties, to identify

---

[2] ICE sent §1509 summonses to at least four news sites, with two organizations reporting ICE pressured them to reveal their sources. *See*  Dhruv Mehrotra, *ICE Is Grabbing Data From Schools and Abortion Clinics*, *WIRED* (Apr. 3, 2023), https://www.wired.com/story/ice-1509-custom-summons/.

[3] "Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509." Available at https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-18-18-nov17.pdf.

and publish the names of government agents, and to create, interact with, and elevate content on the Internet. This type of expressive activity is exactly what Movant engages in when curating and sharing content on Facebook and Instagram. Moreover, the First Amendment's protections apply with special force to anonymous speech, as it "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

These Summonses were not issued in a vacuum. In recent months, DHS's leadership has threatened those that film or post Immigration and Customs Enforcement ("ICE") agents on social media with prosecution "to the fullest extent of the law."[4] DHS has repeatedly equated the recording of government agents in public with violence and harassment against them, even though, as set forth below, such recording is unequivocally an exercise of First Amendment rights.[5] Movant is concerned that government agents are targeting, abducting, arresting, detaining, and abusing people based on nothing more than the views they express and the color of their skin.[6] Movant's social media pages lawfully criticize and publicize DHS and the government agents who Movant views as wreaking havoc in the Montgomery County community by shining a light on that conduct to raise community members'

---

[4] Matthew Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents is "Violence,"* Exposed by the Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/7FF7-WEXX.

[5] Elizabeth Weill-Greenberg, *DHS Says Filming, Posting Videos of ICE Agents Is "Doxxing," Vows Prosecutions*, Truthout (Sep. 10, 2025), https://perma.cc/HAA7-HMZQ; Forbes Breaking News, *Kristi Noem Caims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, (YouTube, July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations.").

[6] See, e.g., Jay Capian King, *The Detention of Mahmoud Khalil is a Flagrant Assault on Free Speech*, New Yorker (Mar. 14, 2025), https://perma.cc/JT7T-5SAP; Mohsen Mahdawi, *I was Detained for My Beliefs. Who Will Be Next?,* N.Y. Times Op. Ed. (May 2, 2025), https://www.nytimes.com/2025/05/02/opinion/mohsen-mahdawi-ice-detention.html; Jonah E. Bromwich et al., *Was First Amendment Violated in Student Arrests? Trump Lawyer Won't Say*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/us/student-protesters-immigration-detention-firstamendment.html; Dan Rosenzweig-Ziff, *How a Georgetown Scholar Went from 'Quiet' Researcher to Detainee*, Wash. Post (May 8, 2025), https://www.washingtonpost.com/education/2025/05/08/georgetown-scholar-badar-khan-suri-cameramiddle-east-forum/; Amanda Holpuch, *Reporter Is Detained by ICE After Reporting on Immigration Protest*, New York Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/us/journalist-arrestedice-georgia-mario-guevara.html; Ben Makuch, *US Free-Speech Rights Shredded Despite Trump Vow to be First-Amendment Champion*, The Guardian (Jun. 19, 2025), https://perma.cc/F3PW-6JXK; *cf. Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637 at *9 (Sept. 8, 2025) (Sotomayor, J., dissenting) ("The Government…has all but declared that all Latinos, U. S. citizens or not, who work low wage jobs are fair game to be seized at any time").

NOTICE OF MOTION AND MOTION TO QUASH SUMMONSES
Misc. Case No._____                                                                                    3

awareness. Doe Decl. ¶¶ 4-9. But Meta's release of Movant's personal information to DHS would expose Movant and those who associate with them to precisely the government actors that Movant is criticizing and chill lawfully protected speech. Anonymity is necessary to protect Movant and those who associate with them from a powerful government apparatus that seeks to punish speech, like Movant's, that the government does not favor.

DHS has failed to meet either the constitutional or statutory requirements to compel disclosure of information regarding Movant's accounts and their associations. And once disclosed, the disclosure cannot be undone. Accordingly, in addition to seeking a final order quashing the summonses, Movant requests that this Court issue immediately an interim order directing Meta not to produce the information pending final resolution of this matter (*see* second Proposed Order filed herewith), as the Court has done in a series of recent similar cases. *E.g.*, *Matter of the Subpoena Number FY25-ELC-0105 v. U.S. Dept. of Homeland Security*, No. 3:25-mc-80284 (N.D. Ca., Oct. 1, 2025), ECF 9; *J. Doe v. U.S. Dept. of Homeland Security*, No. 3:25-mc-80286 (N.D. Cal. Sept. 19, 2025), ECF 4; *Doe/LBRRN v. U.S. Dept. of Homeland Security*, No. 3:25-mc-80288 (N.D. Cal. Sept. 24, 2025), ECF 7.

## BACKGROUND

### I.     Immigration Enforcement Activity in Montgomery County

Montgomery County, Pennsylvania, is home to the second-largest group of residents born outside the United States in the state of Pennsylvania; only Philadelphia County has a larger foreign-born population.[7] Community members have reported seeing ICE agents "every day" over the last several months, creating a state of "terror" that is deterring residents from leaving their homes.[8] ICE agents have carried out a series of well-documented arrests and abusive searches, detentions and arrests. Agents have broken into a home with weapons drawn; they have entered bedrooms where children are sleeping; they have carried out arrests outside stores and health centers; and they have detained a single mother of an

---

[7] U.S. Immigration Population by State and County, Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/charts/us-immigrant-population-state-and-county

[8] Justin Heinze, *'This Is Terror': ICE Makes String of Arrests In Norristown*, Patch (June 5, 2025), https://patch.com/pennsylvania/norristown/terror-ice-makes-string-arrests-norristown; Jeff Gammage and Katie Bernard, *ICE arrests nearly 20 in Norristown as immigrant community calls on Montco commissioners to act,* The Philadelphia Inquirer (June 4, 2025), https://www.inquirer.com/news/ice-arrests-norristown-montgomery-deport-20250604.html.

autistic child in a detention facility five hours away from her home.[9] In one two-week period in early

June, ICE agents arrested more than 20 community members in one small town.[10] The most terrifying

operation occurred on the morning of Wednesday, July 16, when ICE agents wearing masks and combat

fatigues and carrying automatic weapons swarmed a local farmers market and detained at least 14 people,

including workers and customers.[11]

Journalists, nonprofit agencies, and residents of the County have documented ICE arrests by

posting videos and photos to social media and local news websites. One observer captured the arrest of a

cook in a restaurant at a busy shopping mall.[12] On the day of the raid at the farmers market, several videos

showed a crowd of masked officers with automatic weapons in the parking lot of the market, while another

showed officers refusing to answer questions and instructing an observer to turn her phone off.[13] Local

elected leaders have spoken out repeatedly about the devastating impact of the arrests, with one U.S.

Representative describing the situation in Montgomery County as "something like a gulag" and a State

Senator calling the arrests "morally reprehensible."[14] One State Senator representing the County is co-

---

[9] Emily Neil, *Norristown immigrants fearful after ICE raids; Montco officials voice support,* WHYY (June 5, 2025) https://whyy.org/articles/norristown-montgomery-county-ice-immigrants-fearful/;    Jeff    Gammage and Katie Bernard, *ICE arrests nearly 20 in Norristown as immigrant community calls on Montco commissioners to act,* The Philadelphia Inquirer (June 4, 2025), https://www.inquirer.com/news/ice-arrests-norristown-montgomery-deport-20250604.html;    Jeff Gammage and Katie Bernard, *Undocumented mother faces deportation after Montco officials turn her over to ICE. County policy likely to be reviewed,* The Philadelphia Inquirer (June 10, 2025) https://www.inquirer.com/news/pennsylvania/ice-detainer-pennsylvania-montgomery-county-20250610.html

[10] Jeff Gammage and Katie Bernard, *ICE arrests nearly 20 in Norristown as immigrant community calls on Montco commissioners to act,* The Philadelphia Inquirer (June 4, 2025), https://www.inquirer.com/news/ice-arrests-norristown-montgomery-20250604

[11] Emily Neil, *Norristown immigrant community, allies shaken after ICE raid at supermarket,* WHYY (Jul. 18, 2025), https://whyy.org/articles/norristown-immigrants-ice-raid-supermarket/

[12] Jesse Bunch, *They planned to marry this year. An ICE arrest near the King of Prussia mall changed everything,* The Philadelphia Inquirer (Aug. 17, 2025), https://www.inquirer.com/news/immigration-arrest-andres-morales-king-of-prussia-20250817.html

[13] NBC10 Philadelphia, *ICE arrests 14 people at grocery store in West Norriton Township, Pennsylvania,* YouTube (Jul. 16, 2025), https://www.youtube.com/watch?v=RkWoRoYGI9M; Elyse Wechterman, *Opinion: I was there when ICE stormed Gigante. I can attest to the raid's traumatic aftermath,* The Philadelphia Inquirer (Aug. 22, 2025), https://www.inquirer.com/opinion/commentary/immigration-gigante-ice-raid-norristown-moshannon-detention-20250822.html

[14] Emily Neil, *Norristown immigrant community, allies shaken after ICE raid at supermarket,* WHYY (Jul. 18, 2025), https://whyy.org/articles/norristown-immigrants-ice-raid-supermarket/

NOTICE OF MOTION AND MOTION TO QUASH SUMMONSES
Misc. Case No._____                                                      5

1   sponsoring a bill requiring federal agents to identify themselves, while the Montgomery County

2   Commissioners have adopted policies to prohibit ICE collaboration among County employees.[15]

3   ## II.      The "MontCo Community Watch" Facebook and Instagram Accounts

4           Movant operates the "MontCo Community Watch" Facebook and Instagram accounts to spread

5   awareness of immigration enforcement activity in Montgomery County, Pennsylvania, and to share alerts,

6   documentation, and resources to help inform both the immigrant and non-immigrant communities within

7   Montgomery County of their rights, due process, and the humanity of their neighbors. Doe Decl. ¶ 4.

8   These accounts provide information about, among other things, where agents are publicly conducting

9   immigration enforcement activities within Montgomery County.[16] In addition, Movant posts content to

10  the Facebook and Instagram accounts that reflects Movant's personal moral and political commitments to

11  immigrants' rights and their connection to the Montgomery County community. Id. at ¶ 8. These accounts

12  are designed to raise awareness about events of public concern in the community. Id. at ¶¶ 4-9. The content

13  that appears in the accounts' feeds includes both content that Movant creates and content that they repost

14  as part of a curated feed that the accounts' followers can see. Id.

15  ## III.     The Summonses and Meta's Response

16          On September 11, 2025, Meta received two documents labeled "Summons" from DHS citing to

17  19 U.S.C. § 1509. Doe Decl., Exs. A & B. The Summonses demand that records be produced for

18  inspection "[p]ursuant to an investigation being conducted by U.S. Department of Homeland Security,

19  Homeland Security Investigations[.]" Id. Nowhere in the Summonses does DHS identify or cite any actual

20  or potential crime or violation of customs or importation laws. Id. The Summonses specifically seek for

21  inspection: "the identity of the ["MontCo Community Watch" accounts'] users, consisting of name, postal

22  code, country, all email address(es) on file, date of account creation, registered telephone numbers, IP

23

24

---

25  [15] Elena Eisenstadt, *ICE is wearing masks while making arrests across Pennsylvania. Some state lawmakers want
26  to ban them from covering their faces,* The Philadelphia Inquirer (Jul. 23, 2025),
    https://www.inquirer.com/news/pennsylvania/ice-masks-arrests-philly-bill-ban-20250723.html; Jeff Gammage,
    *Montco bars county employees from sharing information with ICE without a legal order,* The Philadelphia Inquirer
27  (June 18, 2025), https://www.inquirer.com/news/pennsylvania/montgomery-county-immigration-status-requests-
    20250618.html.
28  [16] The accounts do not provide non-public identifying information about the individual agents conducting these
    activities.

1  address at account sign up, and logs showing IP address and date stamps for account accesses from

2  02/01/2025 to the present." *Id.*

3       Neither the government nor Meta informed Movant of these Summonses before the original return

4  date reflected on their face. On October 3, 2025, Meta notified Movant via e-mail that unless "[Meta]

5  receive[s] a copy of documentation that [Movant has] filed in court challenging this legal process," by

6  October 13, 2025, it "will respond to the requesting agency with information about the requested []

7  account[s]." *Id.*

8                                    **LEGAL STANDARD**

9       Where, as here, the government seeks information implicating First Amendment-protected

10 activities, the government must satisfy a high bar to compel disclosure. Specifically, an investigation that

11 "intrudes into the area of constitutionally protected rights of speech, press, association and petition"

12 requires the government to "convincingly show a substantial relation between the information sought and

13 a subject of overriding and compelling state interest." *Gibson*, 372 U.S. at 546; *United States v. Rumely*,

14 345 U.S. 41, 46 (1953); *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972). Courts in civil

15 litigation where First Amendment rights are at stake similarly impose a heightened standard before

16 unmasking the identities of Internet users. *See, e.g., Malibu Media, LLC v. John Does 1-16*, 902 F.Supp.2d

17 690, 698-99 (E.D. Pa. 2012); *Art of Living Found. v. Does 1–10*, 2011 WL 5444622, at *4 (N.D. Cal.

18 Nov. 9, 2011); *Enterline v. Pocono Medical Center*, 751 F.Supp.2d 782, 787-88 (M.D. Pa. 2008); *Doe v.

19 Cahill*, 884 A.2d 451, 456-57 (Del. 2005); *Highfields Cap. Mgmt. v. Doe*, 385 F. Supp. 2d 969, 974–76

20 (N.D. Cal. 2005); *Dendrite Int'l Inc. v. Doe*, 342 N. J. Super. 134, 141–42 (App. Div. 2001).

21      Under Rule 45(d)(3)(A) of the Federal Rules of Civil Procedure, "the court where compliance is

22 required must quash or modify a subpoena" that requires disclosure of protected matter or subjects a

23 person to undue burden. The procedures under Rule 45 are made applicable to the federal agency

24 Summonses at issue here pursuant to Rule 81(a)(5), which provides that "these rules"—referring to the

25 Federal Rules of Civil Procedure—"apply to proceedings to compel testimony or the production of

26 documents through a subpoena issued by a United States officer or agency under a federal statute, except

27 as otherwise provided by statute, by local rule, or by court order in the proceedings." Because compliance

28

---

is required in this district because Meta is located here and has been requested to transmit responsive information from here, this district is a proper venue for Movant to file this motion.

**ARGUMENT**

### I.    The Summonses Should Be Quashed Because They Exceed DHS's Statutory Authority.

An administrative subpoena, like the Summonses here, is improper if it seeks records beyond the scope of an investigation authorized by the enabling statute. *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 643 (5th Cir. 1993); *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418–19 (D.C. Cir. 1994). The statute at issue here, 19 U.S.C. § 1509, confers limited authority to DHS in customs investigations to seek records related to the importation of merchandise, including the assessment of customs duties. To obtain judicial enforcement of a § 1509 subpoena, DHS must establish "that the investigation will be conducted pursuant to a legitimate purpose [and] that the inquiry may be relevant to the purpose…" *United States v. Tan*, 16 F.4th 1346, 1353 (9th Cir. 2021). DHS cannot meet this burden and to permit this *ultra vires* subpoena would be to permit DHS to continue to flout statutory requirements.

Identifying anonymous social media users critical of DHS is not a legitimate purpose, and it is not relevant to customs enforcement.[17] Section 1509 addresses customs duties. It authorizes the U.S. Customs Service to request any record that may be relevant to a customs investigation for the purpose of "1) ascertaining the correctness of any entry [of merchandise]; 2) determining the liability of any person for duties, fees, and taxes due to the United states; 3) determining liability for fines and penalties or 4) insuring compliance with the laws of the United States administered by the [Customs Service]."[18] The first three categories permit limited requests relating to imports, and the fourth category is restrained by the first three. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (applying *noscitur a sociis* and refusing to read a general term so broadly that it becomes divorced from its accompanying terms and the intent of Congress).

These demands for Movant's (and others') identifying social media information is entirely unrelated to the importation and exportation of goods. A cursory examination of the publicly facing

---

[17] DHS itself has acknowledged this limitation and, in 2017, cautioned against future abuses of § 1509 summonses, *see supra* note 2.

[18] *Supra* note 3, at 2-3.

information on the subject social media accounts reveals that they are not engaged in commerce, nor are they subject to monetary sanctions or liabilities. *See* Doe Decl., ¶ 7. It is not surprising, then, that the Summonses fail to articulate any nexus between the information sought and an effort to ensure compliance with "duty, fees, and taxes due or duties, fees and taxes which may be due the United States," or any "law or regulation for the entry of the merchandise" administered by the U.S. Customs Service. In fact, the Summonses do not cite *any* underlying criminal or customs related statute linking the request to any acceptable investigative purpose. *See* Doe Decl., Exs. A & B. They merely state that the information is being requested "pursuant to an investigation being conducted by [DHS]."

These Summonses demand information clearly beyond what federal law permits. They are directed at Meta and seek records pertaining to the accounts that Movant administers anonymously.[19] Given the statute's focus on importers, it provides for "special procedures for third-party summonses." 19 U.S.C. § 1509(d). These procedures limit the potential records being requested to those enumerated in 19 U.S.C. § 1508 or those that are related to the illegal importation of merchandise supported by probable cause. 19 U.S.C. § 1509(d)(1)(A)(i)-(ii). Here, the requested records identify internet subscriber information from a social media site, which are not records typically generated in the ordinary course of business of someone "whose activities require the filing of a declaration or entry…" 19 U.S.C. § 1508. Nor is the Movant's identifying information or user IP addresses related to the illegal importation of merchandise—and its classification as such is certainly not supported by probable cause.

This is not the first time DHS has sought to expose the identities of anonymous users beyond the scope of this statutory authority. A 2017 report by the DHS Inspector General ("OIG") found that the Customs and Border Protection Office of Professional Responsibility had misused that authority when it demanded records that would identify an anonymous Twitter user, because those records are not related to importation of merchandise (as, for example, shipping manifests are).[20] OIG concluded that Customs and Border Protection ("CBP") "may have exceeded the scope of its authority" and that it "regularly"

---

[19] It is unclear whether Movant or Meta is the primary subject of the subpoena. As will be discussed further below, it was the position of the OIG's office that Twitter constituted a "third-party record holder" when DHS attempted to identify an anonymous user via § 1509 in 2017. *Supra* note 2, at 2, 3. If this is the case, there are procedural requirements—including intervention and notice requirements for the subject of the subpoena with which neither Meta nor DHS complied. 19 U.S.C. § 1509(d)(3)-(5).
[20] *Supra* note 2, at 2, 3.

issued customs summonses "in violation of [agency] policy."[21] That improper attempt to identify a Twitter user was the subject of a complaint by Twitter in federal court, and CBP subsequently withdrew the summons.[22] Additional reporting shows DHS continues to regularly issue § 1509 subpoena's outside its statutory authority and against OIG recommendations.[23]

Failing to even reference a customs enforcement provision underlying their investigation, DHS has made no cognizable showing that Section 1509 authorizes its attempts to compel Meta to disclose Movant's identity and location, along with records of everyone who accessed the account for some unspecified purpose, and the Summonses should be quashed.

## II.    The Summonses Should Be Quashed Because They Infringe Movant's First Amendment Rights.

In the present case, the Summonses implicate Movant's First Amendment rights, including the (1) right to anonymous online speech, (2) right to record, (3) right to publish, and (4) right to associate, but it advances no compelling interest or substantial relation sufficient to satisfy the stringent standard for intruding upon Movant's rights. The Summonses must therefore be quashed in their entirety.

### A.    *The First Amendment Protects Movant's Right to Criticize the Government—and To Do So Anonymously.*

"'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). And yet, DHS's Summonses demanding that Meta disclose identifying information appear motivated by the government's hostility to Movant's viewpoints and a desire to chill Movant's expressive conduct. By operating the "MontCo Community Watch" accounts to raise community awareness about ICE agents roving Montgomery County, Movant is speaking critically of the government and hoping to contribute to a recognition that the abuses they see as unjust. *See* Doe Decl., ¶¶ 4-9.

---

[21] *Id*. at 3, 4.

[22] *Id*. at 2. Twitter's complaint resisting the unmasking of the anonymous account is available at https://perma.cc/6HZD-WCD4.l

[23] Mehrotra, *supra* note 1 (reporting ICE's widespread use of §1509 to gather materials from news agencies, universities, and abortion clinics).

The First Amendment exists to protect precisely this type of "free discussion of governmental affairs." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). It assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). The discussion of "information relating to alleged governmental misconduct" in particular "has traditionally been recognized as lying at the core" of that purpose. *Butterworth v. Smith*, 494 U.S. 624, 632 (1990). Additionally, Movant and others who publish news "serve as a powerful antidote to any abuses of power by governmental officials," *Mills v. Alabama*, 384 U.S. 214, 219 (1966), and that speech may include "a significant amount of verbal criticism and challenge directed at [law enforcement] officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

That Movant chooses to conduct this expressive activity anonymously does not change the First Amendment analysis. The Supreme Court has been emphatic that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech." *McIntyre*, 514 U.S. at 342. The right to anonymity "is a shield from the tyranny of the majority" that stems from "an honorable tradition of advocacy and of dissent." *Id.* at 357. These rights are no less robust on the Internet, which is one of the "most important places . . . for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017); *see also Reno v. ACLU*, 521 U.S. 844, 870 (1997). Anonymity in this context thus "facilitates the rich, diverse, and far-ranging exchange of ideas." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001).

**B.      *The First Amendment Protects the Right to Record Law Enforcement and Publish That Recording.***

The First Amendment protects the right to "record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012)); *see also Fields v. City of Phila.*, 862 F.3d 353, 356 (3rd Cir. 2017) ("Simply put, the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public");

*Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (videorecording policing of protest was exercising right to film "matters of public interest"); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (political protests); *Bernal v. Sac. Cnty. Sheriff's Dep't*, 73 F.4th 678, 699 (9th Cir. 2023) (outside of home); *Naveed v. City of San Jose*, Case No. 15-cv-05298-PSG, 2016 WL 2957147, at *5 (N.D. Cal. May 23, 2016) (outside of business). It also protects efforts to learn the identities of government agents as a means of accountability. "[D]emanding that the police identify themselves [is] a legitimate activity." *Knox v. Sw. Airlines*, 124 F.3d 1103, 1108 (9th Cir. 1997); *see Noble-Perez v. Robinson*, Case No. 8:22-cv-00037-JVS(JDEx), 2023 WL 6194265, at *11 (C.D. Cal. Aug. 16, 2023) (concluding that "filming with a cell phone" and "asking for [an officer's] name and badge number" is protected First Amendment activity).

As a corollary to the right to record law enforcement conducting business in public, it follows that the First Amendment also protects the right to broadcast such recordings. Just as "[r]ecording police encounters creates information that contributes to discussion about governmental affairs," so too does livestreaming, which "often creat[es] its own record." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023); *see also Fields*, 862 F.3d at 358–59 (3d Cir. 2017); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

In fact, the Supreme Court has held that the publication of lawfully-obtained truthful information concerning a matter of public significance cannot be punished "absent a need . . . of the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979).

## C.    *The First Amendment Protects the Right to Publish the Identity of Law Enforcement Agents.*

The First Amendment robustly protects the right to publish highly personal information about both government officials and private individuals on matters of public concern. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99 (1979); *Oklahoma Publ'g Co. v. Dist. Ct.*, 430 U.S. 308 (1977); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975); *Pubius v. Boyer–Vine.*, 237 F. Supp. 3d 997, 1016 (E.D. Cal 2017). This right applies with particular force to information concerning law enforcement agents. *See Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1249 (N.D. Fla. 2010); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W.D. Wash. 2003). The "publication of truthful personal information about police officers is

linked" to the interest of police accountability "through aiding in achieving service of process, researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue." *Brayshaw*, 709 F. Supp. 2d at 1249. Such records "are of interest to those connected with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Cox*, 420 U.S. at 495.

DHS's Summonses are cryptic, but they are pointed in one respect: They indicate that the government seeks to unmask the users of Facebook and Instagram accounts for an undisclosed purpose and in reliance upon an inapt statutory provision. But consistent with the foregoing authorities, Movant has a protected right to publish information about law enforcement and their activities in the community without fear of retribution. Again, "state action to punish the publication of truthful information seldom can satisfy constitutional standards" when that information is about a "matter of public significance." *Smith*, 443 U.S. at 102–03; *Bartnicki*, 532 U.S. at 527–28.

While Movant intentionally does not post non-public identifying information about ICE agents in their community, the First Amendment protection afforded to Movant's posts would be equally robust even if the posted content contained personal information about individual agents. Courts, for example, have upheld the right of a blogger to publish the home addresses and phone numbers of legislators. *Publius*, 237 F. Supp. 3d at 1016. And they have struck down criminal laws prohibiting the publication of police officers' names, residential/home addresses, and social security numbers. *See Brayshaw*, 709 F. Supp. 2d at 1248–49 (striking down criminal law and holding names and personal addresses of police officers a matter of public significance); *Sheehan*, 272 F. Supp. 2d at 1150 (ruling unconstitutional a statute that prohibited posting the detailed personal information of law enforcement). Even if this case involved the publication of an undercover officer's identity (which it does not), the First Amendment would protect the right to film and publicize it related to a matter of public concern. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1220 (10th Cir. 2007) (recognizing that "[p]ublicity of undercover police officers" and their identities via TV broadcast was "a matter of public interest" protected by First Amendment).

The Facebook and Instagram accounts targeted by the Summonses are focused on a matter of widespread political and social interest—the ongoing immigration raids and ICE enforcement efforts.

---

NOTICE OF MOTION AND MOTION TO QUASH SUMMONSES
Misc. Case No._____                                                          13

Each post forms an "integral part of the story" in Movant's mission to give community members awareness of government actions in Montgomery County. *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1146 (S.D. Cal 2005) (publishing facial expressions of Navy Seals photographed with Iraqi captives are a legitimate public concern). The First Amendment protects Movant's right to publish this information, which informs democratic debate and efforts to seek accountability.

**D.    *The First Amendment Protect Movant's Right to Interact with Online Content, Curate a Feed for Followers, and Associate with Others.***

The rough and tumble of the online social media environment, with an avalanche of content and instant reactions, may not bear much superficial similarity to the Federalist Papers. But that cacophony of voices nevertheless constitutes speech that sits within the core of the First Amendment's protections; Movant is no less entitled to anonymity than was Publius. The process of curating a feed, reposting third-party content, and interacting with the community of viewers, followers, and readers on the Internet is entitled to First Amendment protection. Compiling material into a stream of posts (e.g., on Facebook) requires making decisions about "the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). That activity, in turn, "results in a distinctive expressive product." *Id*. The resulting expressive product cannot be burdened—by an administrative subpoena—because the government disapproves of some portion of content in the compilation. *Id*. at 742 ("[T]he State cannot advance some points of view by burdening the expression of others.") (citing *Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal*., 475 U.S. 1, 20 (1986)).

Just as platforms design their systems to curate feeds for users, so too do individual creators curate feeds. They do so by posting their own content and reposting the content of third parties. These curated feeds are themselves protected by the First Amendment, and they often reflect a person's deep interests and beliefs related to society, ethics, politics, humor, and art. And those curation decisions reflect the results of expressive judgments, editorial and otherwise, that have long been protected by the First Amendment. *See Moody*, 603 U.S. at 709 (citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 185, 189–190 (1997) (compilation of third-party speech into a repertoire of cable programming was expressive) and *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) (selection of participants in a parade was expressive)).

Movant's creation of content, and their curation of others' original content, in the "MontCo Community Watch" Facebook and Instagram feeds are entitled to protection. Movant includes content in the accounts' feeds for a wide variety of reasons, including that Movant considers the content interesting, worth viewing, humorous, unusual, surprising, and, at times, upsetting. Doe Decl. ¶ 8. As courts have found, any repost or "retweet" of such content is "not necessarily an endorsement of the original." *Flynn v. Cable News Network*, 621 F. Supp. 3d 432, 439 (S.D.N.Y. 2022). The Summonses' targeting of Movant's Facebook and Instagram accounts based on their posting or reposting of content on social media chills the exercise of this kind of protected expressive activity.

**E.    Given the First Amendment Rights at Stake, the Summonses Fail to Meet the High Threshold for Compelling Disclosure of Movant's Identity.**

Because the foregoing demonstrates that the Summonses "intrude" on numerous fundamental First Amendment rights, DHS must—as set forth above—"convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson*, 372 U.S. at 546. Said another way: where, as here, "governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests." *Bursey*, 466 F.2d at 1083. DHS must also satisfy the separate and well-established legal test for exposing the identity of an anonymous speaker in the Northern District. *See Highfields*, 385 F. Supp. 2d 969. DHS cannot satisfy either of these exacting tests.

*First*, the Summonses fail to identify a government interest—let alone a compelling government interest—to warrant disclosure of the "name, postal code, country, all email address(es) on file, date of account creation, registered telephone numbers, IP address at account sign up, and logs showing IP address and date stamps for account accesses" associated with the targeted Facebook account. The Summonses' vague reference to an "investigation being conducted by U.S. Department of Homeland Security, Homeland Security Investigations" does not come close to establishing the compelling interest needed to invade Movant's rights. Not only is the speech targeted by the Summonses protected and thus insufficient to give rise to a criminal (or customs) investigation, *see supra* sections A.1-4, DHS must do more than simply claim a general interest in enforcing the law when issuing summonses with such serious First Amendment implications. "Governmental action does not automatically become reasonably related

to the achievement of a legitimate and substantial government purpose by mere assertion." *Bates v. City of Little Rock*, 361 U.S. 516, 525 (1960). DHS may be offended by the contents and viewpoint posted on the Facebook and Instagram feeds, but just because it "dislike[s] being the object of abusive language," does not mean that the government is permitted "to use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1174 (9th Cir. 2013).

**Second**, to the extent that these Summonses relate to DHS's campaign to punish social media posters speaking about immigration enforcement agents, that is not an interest that could override Movant's First Amendment rights. Even through Movant does not do so, publishing the "names, addresses, and numbers" of law enforcement is lawful and does not constitute "doxing." *See Sheehan*, 272 F. Supp 2d at 1143; *see also Brayshaw*, 709 F. Supp. 2d at 1249 ("Defendant cites no authority for the proposition that truthful, lawfully-obtained, publicly-available personal identifying information constitutes any mode of constitutionally proscribable speech."). Indeed, caselaw makes clear that the publication of officers' names and likenesses maintains its protection "*even if* publishers are aware that their actions could result in third parties making threats to the individuals identified in the news"—facts that are not present here. *Alvarado*, 493 F.3d at 1210 (emphasis added).

**Third**, Movant's content is vastly different from the First Amendment's narrow exemptions for speech that constitutes a "true threat" or an "incitement to violence." These exemptions allow the government to punish threatening expression only if the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Virginia v. Black*, 538 U.S. 343, 359 (2003); or if the "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (emphasis added).

**Fourth**, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958)). The Summonses lack any basis to evaluate what

---

governmental interest, if any, supports the demands for Movant's identity, associations, and other personal information. The Supreme Court has emphasized:

> The government may regulate in the [First Amendment] area only with narrow specificity," Button, 371 U. S., at 433,.... When it comes to "a person's beliefs and associations," "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution."

*Id.*, at 610-11 (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971)). A required disclosure must be "narrowly tailored to the State's objective." *Id.*

The Summonses here make no such showing. They do not demonstrate how Movant's identity—or the identity of any user accessing the accounts at issue—could substantially relate to a criminal or customs investigation. Again, the accounts, their contents, and the actions taken by Movant and others sharing them, are constitutionally protected and consequently cannot give rise to a criminal investigation or charge that warrants the disclosure DHS demands. *See Gibson¸* 372 U.S. at 557 (holding unconstitutional a state legislative subpoena demanding identity information about members of a civil rights organization); *Bursey*, 466 F.2d at 1085 (demands for identities of people who worked on newspaper and pamphlets infringed associational privacy under First Amendment).

**Finally,** DHS cannot satisfy the Northern District's separate test for exposing an anonymous speaker as articulated in *Highfields*, 385 F. Supp. 2d 969.[24] This test requires courts to "go beyond the pleadings to determine if there is an evidentiary basis for concluding that the requested discovery is appropriate." *In re PGS Home Co. Ltd*, No. 19-MC-80139-JCS, 2019 WL 6311407 *5 (N.D. Cal. Nov. 25, 2019) (citing *Highfields*, 385 F. Supp. 2d at 975). The party seeking the disclosure must demonstrate "a prima facie case on the merits of its underlying claim," and then the "court must balance[] the need for the discovery against the First Amendment interest at stake." *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022) (citing *Dendrite Int'l, Inc. v. Doe No. 3,* 775 A.2d 756, 760–61 (N.J. Super. Ct. App. Div. 2001); *Highfields*, 385 F. Supp. 2d at 974–75). DHS has not

---

[24] District courts in the Ninth Circuit and across the country routinely apply *Highfields* and tests echoing it to ensure that the identities of anonymous online speakers are not revealed without parties providing an adequate showing and considering the interests of all parties. *See, e.g., In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d at 876; *Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp*., No. 12-CV-10803, 2014 WL 10319321 *5 (E.D. Mich. July 2, 2014); *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 132 (D.D.C. 2009); *but cf. Doe v. S.E.C.*, No. C 11-80209 CRB, 2011 WL 5600513 at *1, *3 n.3 (N.D. Cal. Nov. 17, 2011) (applying *Brock v. Local 375, Plumbers Int'l Union*, 860 F.2d 346, 350 (9th Cir. 1988) to assess a request to identify an anonymous commercial speaker).

demonstrated a prima facie case for any underlying allegation. Additionally, DHS's failure to meet its burden under the first step of *Highfields* compels the conclusion that it lacks the prerequisite "need for the discovery" sought in the Summonses. *See Highfields*, 385 F. Supp. 2d at 974–75. This, in turn, confirms that DHS cannot demonstrate the compelling government interest required by *Gibson*.

In sum, exposing Movant's identity serves no substantial relation to a legitimate investigative purpose and will not further an overriding or compelling government interest. The Summonses should be quashed because they violate Movant's First Amendment rights. They threaten to irreversibly extinguish Movant's anonymity and risks exposing Facebook and Instagram account users to "reprisals and other forms of public hostility" that hinder the exercise of First Amendment rights. *Gibson*, 372 U.S. at 570 ("[W]hether a group is popular or unpopular, the right of privacy implicit in the First Amendment creates an area into which the Government may not enter."); *see also Americans for Prosperity Found.*, 594 U.S. at 606–07 (the Supreme Court noted "the vital relationship between freedom to associate and privacy in one's associations") (citing *N.A.A.C.P v. Alabama*, 357 U.S. 449, 462 (1958)).

**III.    The Court Should Decide This Motion as Soon as Possible.**

Movant respectfully requests that this motion be heard and decided as quickly as possible. In the typical case where a government agency issues an administrative subpoena seeking records, the urgency of judicial review to protect a person's privacy may not be present. But in cases, such as this one, where "an administrative subpoena is directed to a party other than the holder of a privacy interest in the targeted items, the rights-holder will often not be afforded an opportunity to object on constitutional grounds," and—unless the recipient has a reason to resist it—the subpoena will be "for all practical purposes self-executing." *Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*, 89 F. Supp. 2d 1144, 1151 (N.D. Cal. 2000).

The need to protect the targeted social media accounts' anonymity is urgent and profound because Meta has committed to revealing its user's identity to DHS unless Movant seeks relief in court. Specifically, on October 3, 2025, Meta sent emails stating that it must "receive a copy of documentation … challenging this legal process," by October 13, 2025,[25] or it "will respond to the requesting agency with information about the requested [social media] account[s]." Doe Decl. ¶ 10. Movant is thus in

---

[25] In subsequent communications with undersigned counsel, attorneys for Meta agreed not to produce Movant's information to the government on or before October 16, 2025, to provide time for Movant to file this action.

immediate danger of having their personal information shared with DHS, and therefore in danger of being targeted for harassment, detention, and persecution. Any persecution of Movant would be baseless, unlawful, and unjust, but could still cause a great deal of irreparable harm. Movant has been overwhelmed by the anxiety caused by learning that the government is targeting their speech based on the viewpoints expressed, and maintaining the ability to operate these social media pages anonymously is the only way to stay shielded from persecution and harassment. *Id.* at ¶¶ 18-19.

To the extent that DHS might argue the Court should defer a ruling until DHS decides to seek enforcement of the administrative subpoenas, DHS is wrong. Movant has a privacy interest protected by the ECPA and no reasonable opportunity for an adversarial proceeding to object to Meta's willingness to cooperate with the Summonses—a situation which entitles Movant to pre-enforcement judicial determination. *See Hell's Angels*, 89 F. Supp. 2d at 1153. Movant is at the mercy of Meta's whim and this Court's intervention is the only process that can protect Movant.

If Meta complies with DHS's demands, Movant's loss of anonymity would be irreversible. "Anonymity, once lost, cannot be regained." *Rancho Publ'ns v. Superior Court*, 68 Cal. App. 4th 1538, 1541 (1999); *Does I thru XXIII v. Adv. Textile Corp.*, 214 F.3d 1058, 1072 (9th Cir. 2000) (observing that the "question whether plaintiffs may use pseudonyms will be moot" if forced to reveal names in litigating anonymity). Here, Movant's dilemma is real, and Movant's fear of persecution is neither imagined nor exaggerated. The Summonses arise in the context of the Trump administration's public statements equating the recording of ICE agents with violence against law enforcement officers.[26] The government's threats do not merely draw a parallel between violence and constitutionally protected speech, the government has stated its intent to prosecute individuals for engaging in speech like Movant's "to the fullest extent of the law."[27] This Court's urgent intervention is necessary to protect Movant's fundamental Constitutional rights and prevent the government from trying to silence speech it does not favor.

---

[26]   Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, at 00:21 (YouTube, July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations.")

[27]   Matthew Cunningham-Cook, *DHS Says Masking and Posting Videos of ICE Agents is "Violence,"* Exposed by the Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/2C94-HU7M; *Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement*, Department of Homeland Security (July 11, 2025), https://perma.cc/W52R-48X3.

## CONCLUSION

For the reasons stated above, Movant requests that the Court issue an order quashing the Summonses in their entirety with respect to the "MontCo Community Watch" Facebook account and the "@montcowatch" Instagram account.

Dated: October 16, 2025                     Respectfully submitted,


By: */s/ Jacob Snow*

Jacob Snow (CA Bar No. 270988)
Matthew T. Cagle (CA Bar No. 286101)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.

Witold J. Walczak (*pro hac vice* to be filed)
Stephen A. Loney, Jr. (*pro hac vice* to be filed)
Ari Shapell (*pro hac vice* to be filed)
Keith Armstrong (*pro hac vice* to be filed)

AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA

Susan Lin (*pro hac vice* to be filed)
Jonathan H. Feinberg (*pro hac vice* to be filed)
Grace Harris (*pro hac vice* to be filed)

KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN, LLP

Seth Kreimer (*pro hac vice* to be filed)

Caitlin Barry (*pro hac vice* to be filed)


*Attorneys for Movant*