Stephen A. Loney, Jr. (admitted *pro hac vice*)
Ari Shapell (admitted *pro hac vice*)
Keith Armstrong (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
sloney@aclupa.org
ashapell@aclupa.org
karmstrong@aclupa.org

Jacob Snow (CA Bar No. 270988)
Matthew T. Cagle (CA Bar No. 286101)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA,
INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
jsnow@aclunc.org
mcagle@aclunc.org

*Attorneys for Movant*

Jonathan H. Feinberg (admitted *pro hac vice*)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN, LLP
718 Arch St. Suite 501 South
Philadelphia, PA 19106
Telephone: (215) 925-4400
jfeinberg@krlawphila.com

Seth Kreimer (admitted *pro hac vice*)
3501 Sansom St.
Philadelphia, PA 19104
Telephone: (215) 898-7447
skreimer@law.upenn.edu

Caitlin Barry (admitted *pro hac vice*)
Villanova University
Charles Widger School of Law
299 N. Spring Mill Rd.
Telephone: (610) 519-3216
caitlin.barry@law.villanova.edu

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In the Matter of Summons Numbers HSI-PH-2025-082814-001 and HSI-PH-2025-082819-001:*<br><br>J. DOE,<br><br>            Movant,<br><br>            v.<br><br>THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>            Respondent. | Case No.: 3:25-mc-80325-PHK<br><br>**MOVANT'S REPLY TO RESPONDENT'S OPPOSITION TO MOTION TO QUASH**<br><br>Date: January 14, 2026<br>Time: 2:00 p.m.<br>Courtroom: F, 15th Floor<br><br>Hon. Peter H. Kang |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 1

I.    Absent a Valid Administrative Subpoena, the ECPA Protects Movant's Data ............................ 1

II.   The Summonses Are Not Valid ....................................................................................... 2

   A.    The Summonses Fall Outside What Is Authorized by 19 U.S.C. § 1509 .................................. 2

      1.    The plain text of § 1509 authorizes summonses only for records pertaining to merchandise ................................................................................................ 2

      2.    Neither the statute nor its legislative history supports DHS's effort to expand its power under Section 1509 ........................................................................... 4

      3.    DHS's reliance on child pornography suppression case law is unavailing ......................... 7

   B.    DHS Cannot Establish that the Records Summoned Are Relevant and Material to an Investigation into Violations of 18 U.S.C. § 115 ........................................................... 8

III.  The Summonses Chill Movant's First Amendment Rights Without Achieving a Sufficiently Important Governmental Interest ........................................................................... 9

   A.    The Summonses Implicate Movant's First Amendment Rights ............................................. 9

   B.    The Summonses Cannot Survive the Applicable Exacting Scrutiny Standard ......................... 11

   C.    Movant Presents a Prima Facie Case Showing a Chilling of First Amendment Associational Rights ........................................................................................... 13

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ........................................................................... 10, 11, 12, 14

*Askins v. U.S. Dep't of Homeland Sec.,*
  899 F.3d 1035 (9th Cir. 2018) ................................................................... 9

*Baird v. State Bar of Ariz.,*
  401 U.S. 1 (1971) .................................................................................. 10

*Begay v. United States,*
  553 U.S. 137 (2008) ................................................................................ 6

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
  860 F.2d 346 (9th Cir. 1988) ................................................................... 12

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................................. 12

*City of Houston, Tex. v. Hill,*
  482 U.S. 451 (1987) ................................................................................ 9

*Cognosphere Pte. Ltd. v. X Corp.,*
  No. 23-MC-80294-PHK, 2024 WL 4227594 (N.D. Cal. Sept. 18, 2024) ..................... 10, 11

*CSX Transp., Inc. v. Ala. Dep't of Revenue,*
  562 U.S. 277 (2011) ................................................................................ 6

*Doe v. DHS,*
  No. 25-mc-80284 (N.D. Cal. Sep. 18, 2025) ................................................. 15

*Doe v. Reed,*
  561 U.S. 186 (2010) ............................................................................... 12

*Doe v. U.S. S.E.C.,*
  2011 WL 5600513 (N.D. Cal. Nov. 17, 2011) ................................................ 13

*Doe v. United States SEC,*
  No. 3:11-mc-80184, 2011 WL 4593181 (N.D. Cal. Oct. 4, 2011) ...................... 2, 9, 10, 11

*Doe/LBRRN v. DHS,*
  No. 25-mc-80288-AGT (N.D. Cal. Sep. 19, 2025) .......................................... 15

*Dole v. Service Employees Union, AFL-CIO, Local 280,*
  950 F.2d 1456 (9th Cir. 1991) .............................................................. 12, 14

*Gustafson v. Alloyd Co.,*
  513 U.S. 561 (1995) ................................................................................ 6

*Hartman v. Moore*,
    547 U.S. 250 (2006) ................................................................................................12, 14

*In re Anonymous Online Speakers*,
    661 F.3d 1168 (9th Cir. 2011) .................................................................................10

*In re AT&T Non-Disclosure Order*,
    No. 25-MR-1769, 2025 WL 3079326 (D. N. M. Nov. 4, 2025) ...........................1

*In re Subpoena No. 25-1431-014*,
    No. 25-mc-00039-MAK, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025)................13

*In the Matter of Subpoena Number FY25-ELC-0105: Doe v. DHS*,
    No. 3:25-mc-80286 (N.D. Cal. Sep. 18, 2025) ...................................................15

*Jones v. Meta Platforms, Inc.*,
    No. 25-MC-80165-TSH, 2025 WL 2308494 (N.D. Cal. Aug. 11, 2025) ...........11

*London v. Does 1–4*,
    279 F. App'x 513 (9th Cir. 2008) .............................................................................11

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) .................................................................................................10

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ......................................................................................10, 12, 14

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
    595 U.S. 109 (2022) ...................................................................................................4

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
    No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ....13

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) .................................................................................................11

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) ...................................................................................................4

*Shelton v. Tucker*,
    364 U.S. 479 (1960) .................................................................................................12

*Smythe v. Does 1-10*,
    No. CV 15-4801-R, 2015 WL 12819173 (C.D. Cal. Sept. 25, 2015)................11

*United States v. Barnes*,
    No. 20-30059, 2021 WL 4938126 (9th Cir. Oct. 22, 2021) ...................................7

*United States v. Cray*,
    673 F. Supp. 2d 1368 (S.D. Ga. 2009) ....................................................................7

*United States v. Google LLC,*
    690 F. Supp. 3d 1011 (N.D. Cal. 2023) ...............................................................10

*United States v. Marbelt,*
    129 F. Supp. 2d 49 (D. Mass. 2000) ....................................................................7

*United States v. McLean,*
    No. SA-09-CR-270, 2010 WL 376381 (W.D. Tex. Jan. 25, 2010) ......................7

*United States v. Merrell,*
    88 F. Supp. 3d 1017 (D. Minn. 2015) ..................................................................7

*United States v. Powell,*
    379 U.S. 48 (1964) ..............................................................................................12

*United States v. Rubin,*
    2 F.3d 974 (9th Cir. 1993).....................................................................................3

*United States v. United States Dist. Court,*
    407 U.S. 297 (1972) ..............................................................................................9

*United States v. Wellbeloved-Stone,*
    No. 3:17-cr-00014, 2018 WL 1973286 (W.D. Va. Apr. 26, 2018)......................7

*Ward v. Thompson,*
    No. 22-16473, 2022 WL 14955000 (9th Cir. Oct. 22, 2022)................... 10, 12, 14

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..............................................................................................4

*Yates v. United States,*
    574 U.S. 528 (2015) ........................................................................................4, 5, 6

**Statutes**

18 U.S.C. § 115 .............................................................................................................4, 8, 9

18 U.S.C. § 1519 ...................................................................................................................4

18 U.S.C. § 2702(a) .........................................................................................................1, 2

18 U.S.C. § 2702(c) .........................................................................................................1, 2

18 U.S.C. § 2703(c) .........................................................................................................1, 2

18 U.S.C. § 2704(b) ..............................................................................................................2

19 U.S.C. 1508 ................................................................................................................3, 5

19 U.S.C. 1509 .........................................................................................................*passim*

19 U.S.C. 1509(a) ....................................................................................................*passim*

19 U.S.C. § 1509(d) ........................................................................................................3, 7

Pub. L. No. 71-361, § 509, 46 Stat. 590 ....................................................................................5

Pub. L. No. 95-410, § 105, 92 Stat. 888 ....................................................................................5

Pub. L. No. 99-570, § 3117(2), 100 Stat. 3207 .........................................................................5

**Rules**

Fed. R. Civ. P. 45 ......................................................................................................................2

Fed. R. Civ. P. 81 ......................................................................................................................2

**Other Authorities**

124 Cong. Rec. 27839 (1978) ....................................................................................................5

132 Cong. Rec. 26474 (1986) ....................................................................................................5

1978 U.S.C.C.A.N. 2211 ...........................................................................................................5

C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, Reason (Dec. 22, 2025), https://reason.com/2025/12/22/dhs-says-recording-or-following-law-enforcement-sure-sounds-like-obstruction-of-justice/ ..................................................................15

Grace Bellinghausen, *Secretary Kristi Noem addresses surge in attacks on ICE agents in Tampa*, WBMA (Jul. 13, 2025), https://abc3340.com/news/nation-world/secretary-kristi-noem-addresses-surge-in-attacks-on-ice-agents-in-tampa-dhs-us-immigration-and-custo ............................................14

*Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509*, DHS: Office of Inspector General (Nov. 16, 2017), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-18-18-nov17.pdf ........................3, 6

Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is 'Violence'*, The American Prospect (Sep. 9, 2025), https://prospect.org/2025/09/09/2025-09-09-dhs-claims-videotaping-ice-raids-is-violence/ ....................................................................................................................15

S. Rep. No. 95-778 (1978) .........................................................................................................5

Walter Olson, *DHS Says Videotaping ICE Agents Is Illegal. Federal Courts Disagree*, Cato Institute (Oct. 9, 2025), https://www.cato.org/commentary/dhs-says-videotaping-ice-agents-illegal-federal-courts-disagree ......................................................................................................15

**INTRODUCTION**

Movant J. Doe and those associated with the Facebook account "MontCo Community Watch" and the Instagram account "@montcowatch" publish content critical of government agencies and officials. That content is core First Amendment protected activity. Now, the very governmental agency J. Doe criticizes has issued administrative summonses (the "Summonses") to Meta Platforms, Inc. ("Meta") seeking to unmask its critics. The Department of Homeland Security's ("DHS's") Opposition to the Motion to Quash confirms its transparent attempt to abuse the summons process, intimidate J. Doe, and chill critical speech. The Summonses should be quashed because (1) the Electronic Communications Privacy Act ("ECPA") prohibits Meta from disclosing the information sought; (2) the Summonses are not authorized under 19 U.S.C. § 1509; and (3) they violate core First Amendment protections.

**ARGUMENT**

**I.      Absent a Valid Administrative Subpoena, the ECPA Protects Movant's Data.**

The Stored Communications Act (the "SCA"), enacted as Title II of the ECPA, 18 U.S.C. §§ 2701–2713, "protects the privacy of stored electronic files held by providers about their users, customers, and subscribers" and outlines the limited circumstances under which the government can access this data. *See In re AT&T Non-Disclosure Order*, No. 25-MR-1769, 2025 WL 3079326, at *3 (D. N. M. Nov. 4, 2025). The SCA sets the default rule that "a provider of remote computing service or electronic communication service to the public" may only disclose "information pertaining to a subscriber to or customer of such service" if certain specific requirements are met, 18 U.S.C. § 2702(c), including the condition that the governmental entity use a valid "administrative subpoena authorized by a Federal or State statute," *id.*, § 2703(c)(2). Meta is undisputedly an electronic communication service provider under the ECPA, *see In re AT&T*, 2025 WL 3079326, at *1, and DHS (a government entity under ECPA) clearly issued the Summonses to seek subscriber or customer records for a Facebook and an Instagram account.[1]

DHS's only response is to assert that it seeks only "non-content records" and that ECPA does not contain a provision through which a customer can move to prevent disclosure of "non-content records." Opp. at 10. Critically, DHS does not engage with the substance of Section 2702; it does not dispute that

---

[1] The Summonses seek "the identity of the below listed . . . users, consisting of name, postal code, country, all email address(es) on file, date of account creation, registered telephone numbers, IP address at account signup, and logs showing IP address and date stamps for account accesses." Dkt. Nos. 1-3, 1-4.

ECPA broadly prohibits disclosure to the government of any "information pertaining to a subscriber to or customer" of an electronic communication service. 18 U.S.C. § 2702(a)(3). It argues only that there is no ***procedural mechanism for subscribers*** to "prevent disclosure" of protected information. Opp. at 10 (quoting *Doe v. United States SEC*, No. 3:11-mc-80184, 2011 WL 4593181, at *2 (N.D. Cal. Oct. 4, 2011) ("*SEC I*")).[2] DHS ignores that the Federal Rules provide the mechanism. *See* Dkt. No. 1 at 1, n.1 (citing Fed. R. Civ. P. 45(d)(3)(A) and 81(a)(5)); *accord* Dkt. No. 3 at 2 (confirming that "[u]nder Rule 81, Rule 45 applies to the administrative summonses at issue here"). And DHS does not explain how the so-called "non-content records" sought here fall outside the plain language prohibition on disclosure of "information pertaining to a subscriber to or customer . . . ." 18 U.S.C. § 2702(c).

The ECPA prevents DHS from obtaining the information it seeks here without a warrant, a court order, consent, or a statutorily authorized administrative subpoena. 18 U.S.C. §§ 2702(a)(3), 2703(c). For the reasons set forth below, the Summonses exceed the statutory authority under 19 U.S.C. § 1509, and Meta is thus prohibited under ECPA from disclosing the subscriber records to DHS.

## II.     The Summonses Are Not Valid.

### A.     The Summonses Fall Outside What Is Authorized by 19 U.S.C. § 1509.

#### 1.  The plain text of § 1509 authorizes summonses only for records pertaining to merchandise.

DHS issued documents entitled "SUMMONS," "To Appear and/or Produce Records," under "19 U.S.C. § 1509." Dkt. Nos. 1-3, 1-4. As to the agency's summons authority, Section 1509(a) provides:

(a) Authority

In any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service, the Secretary (but no delegate of the Secretary below the rank of district director or special agent in charge) may--
        . . .
(2) summon, upon reasonable notice—

---

[2] DHS relies on a partial quote from *dicta* in *SEC I*, which certainly did not suggest that ECPA provides no protection over subscriber information. Citing 18 U.S.C. § 2704(b)(1)(A), the court noted that the ECPA provides its own mechanism for seeking to quash subpoenas "where the governmental entity is seeking the contents of customer communications, customers may challenge disclosure." 2011 WL 4593181, at *2. As the movant in that case relied on that ECPA mechanism rather than Rules 45 and 81, the court there had no occasion to recognize—as this Court has here—that the Federal Rules also supply a procedural basis for subscribers to seek an order quashing subpoenas for protected information.

. . .

(D) **any other person he may deem proper**;

to appear before the appropriate customs officer at the time and place within the customs territory of the United States specified in the summons (except that no witness may be required to appear at any place more than one hundred miles distant from the place where he was served with the summons), **to produce records, as defined in subsection (d)(1)(A)**, and to give such testimony, under oath, as may be relevant to such investigation or inquiry; . . .

19 U.S.C. § 1509(a) (emphasis added). And the only records that may be produced under a Section 1509 summons are "records, as defined in subsection (d)(1)(A)." *Id.* at (a)(2). Under Section 1509(d)(1)(A), "[t]he term 'records' includes those—(i) required to be kept under section 1508 of this title; or (ii) regarding which there is probable cause to believe that they pertain to merchandise the importation of which into the United States is prohibited." Section 1508, entitled "Recordkeeping," only requires keeping records **related to imports and exports**. 19 U.S.C. § 1508.

Thus, the plain text of Section 1509(a) only authorizes summonses to produce records pertaining to imports and exports and records for which there is probable cause to believe pertain to merchandise that is illegal to import. 19 U.S.C. §§ 1508, 1509(a)(2), (d)(1)(A). The subscriber information for social media accounts publishing speech critical of ICE that DHS seeks is completely unrelated to the importation/exportation of merchandise; the records are outside the scope of DHS's summons power under Section 1509. *See United States v. Rubin*, 2 F.3d 974, 976–77 (9th Cir. 1993) (Customs Service could not summon records unless the records pertained to importation and were normally kept in ordinary course of business). DHS's own Office of Inspector General ("OIG") adopted this straightforward reading of Section 1509 in a 2017 report condemning DHS overreach.[3]

In its Opposition, DHS tellingly ignores the position taken by its own OIG. Instead, DHS declares, without support, that DHS issued the summonses pursuant to Section 1509(a)(1), and not subsection (a)(2). Opp. at 10. However, subsection (a)(1) plainly authorizes only the examination of records, ***not*** the issuance of summonses to produce records. And in any event, ECPA prohibits Meta from disclosing subscriber information to DHS without a valid administrative subpoena. Thus, DHS cannot seek to simply

---

[3] *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509*, DHS: Office of Inspector General (Nov. 16, 2017), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-18-18-nov17.pdf ("OIG Rpt."); *see also* Dkt. No. 1 at 9–10 (discussing OIG Rpt.).

"examine" the records as a method of circumventing the limits on its summonses authority under (a)(2).

### 2. Neither the statute nor its legislative history supports DHS's effort to expand its power under Section 1509.

Although the Summonses did not identify a purpose, DHS now claims (at 8) that the Summonses seek to investigate an alleged violation of 18 U.S.C. § 115. This alleged purpose starkly highlights DHS's improper use of Section 1509, which is limited to investigations "for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or *for insuring compliance with the laws of the United States administered by the United States Customs Service*." 19 U.S.C. § 1509(a) (emphasis added). DHS isolates the italicized statutory language to argue that it authorizes summonses to investigate *any* law enforced by the U.S. Customs Service, or its successor DHS, regardless of whether that law is related to merchandise. Opp. at 9. DHS's expansive interpretation of the italicized statutory language runs afoul not only of its own OIG's reading, but also of the Supreme Court's instructions on statutory interpretation. "Congress does not usually 'hide elephants in mouseholes'" when drafting an otherwise limited grant of powers to federal agencies. *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). In other words, Congress did not, in establishing DHS, silently embed unlimited subpoena authority in a provision keyed to the importation of goods.

Statutory terms, particularly those involving the scope of agency powers, must be interpreted in accordance with the entirety of the statute. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). In *Yates*, the Supreme Court rejected the government's broad reading of the Sarbanes-Oxley Act's prohibition on the destruction of any "record, document, or tangible object." *Yates*, 574 U.S. at 532 (quoting 18 U.S.C. § 1519). In so doing, the Court examined the purpose of the provision (*id.* at 535–36); the captions, subtitles, and structure of the statute (*id.* at 539–40); and the statutory interpretation canons of *noscitur a sociis* and *ejusdem generis* (*id.* at 543–45). Applying those principles here only confirms that the DHS OIG's conclusion that Section 1509 is limited to the investigation of the importation of merchandise and any related taxes, duties, or fees.

First, as to legislative history and purpose, Section 1509 originated from Section 509 of the Tariff Act of 1930, under which Customs Service officers had authority "respecting any imported merchandise

then under consideration or previously imported within one year," to "require the production of any letters, accounts, contracts, invoices, or other documents relating to said merchandise . . . ." Pub. L. No. 71-361, § 509, 46 Stat. 590, 733. The Customs Procedural Reform and Simplification Act of 1978 was the first piece of legislation to substantially revise Section 1509 and was the origin of the authority "for insuring compliance with the law of the United States administered by the United States Customs Service." Pub. L. No. 95-410, § 105, 92 Stat. 888, 889–91. The revision was meant to provide the Secretary of the Treasury with authority to examine certain records and witnesses *regarding the entry of imports*. *See* 124 CONG. REC. 27839 (1978) (statement of Sen. Russell B. Long) (the revised Act "would impose recordkeeping requirements on importers and strengthen Customs authority to inspect *import related* books and records.") (emphasis added). The Senate Report from the Committee on Finance on the 1978 legislation emphasized that the purpose of the Act was "to permit the establishment of more efficient and flexible procedures for handling the documentary and financial aspects **of *import transactions*,**" "to relate the amount of the ***customs penalty*** for false and material statements to customs to the culpability of the offender and insure due process for persons potentially liable for penalties," and "to modify numerous ***customs procedures*** to expedite the processing of goods and individuals while reducing administrative costs for the government." S. REP. No. 95-778, at 1 (1978), as reprinted in 1978 U.S.C.C.A.N. 2211, 2212 (emphasis added). The purpose of the 1978 Act, with the incorporation of the statutory phrase in question, was not to expand the power of the United Statues Customs Service beyond that related to customs duties.

The next relevant change to Section 1509 came with the Anti-Drug Abuse Act of 1986, housed under the subtitle "Customs Enforcement Act of 1986," which included amendments to the Tariff Act of 1930 related to: entry and reporting requirements for arrivals into the United States; aviation smuggling; and, the seizure and forfeiture of smuggled merchandise, among other things. *See* 132 CONG. REC. 26474–75 (1986). The 1986 Act expanded records that could be summoned under Section 1509(a)(2) beyond those records that are required to be kept under what is now Section 1508 to include records "regarding which there is probable cause to believe they pertain to merchandise the importation of which into the United States is prohibited." Pub. L. No. 99-570, § 3117(2), 100 Stat. 3207, 3207–84.

The captions, subtitles, and structure of the overall statute confirm these limits. *See Yates,* 574 U.S. at 539–40. Title 19 is entitled "Customs Duties." Section 1509 of Title 19 falls under Part III, Subtitle

III, Chapter IV of Title 19 and is entitled "Ascertainment, Collection, and Recovery of Duties." Section 1509 itself is entitled "Examination of books and witnesses." By locating Section 1509 under portions of an overall act pertaining to customs duties and the ascertainment and collection of such duties, the legislature meant for the "books and witnesses" to be examined under Section 1509 to be related to customs duties. *See also* OIG Rpt. at 2.

Finally, traditional statutory interpretation canons reinforce the limited nature of DHS's authority under Section 1509. Under the principle of *ejusdem generis*, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *Yates*, 574 U.S. at 545 (citations omitted). *Ejusdem generis* ensures that the latter "all encompassing" words are not interpreted in a manner that renders the prior specific terms meaningless. *Id.* (citing *Begay v. United States*, 553 U.S. 137, 142 (2008); *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011)). In Section 1509, the DHS's authority to examine records is limited to investigations conducted for the purpose of:

> (1) "ascertaining the correctness of any entry";
> (2) "determining the liability of any person for duty, fees and taxes due [or those that may be due] to the United States";
> (3) "for determining liability for fines and penalties"; or
> (4) "for insuring compliance with the laws of the United States administered by the United States Customs Service."

19 U.S.C. § 1509(a). Had Congress intended the last clause to be interpreted as broadly as DHS now presents, there would be no need for the prior three clauses—they would be mere surplusage. The last clause is properly limited to laws which are related to the propriety of the importation of merchandise and any taxes, fines, or penalties related to that merchandise.[4] This interpretation would permit, for example, DHS to have authority under Section 1509 to examine records pertaining to drugs or child pornography, prohibited merchandise often imported into this country, without subverting the purpose of the act.

The clear purpose of Section 1509—as shown through the legislative history, the structure of the statute, and the principles of statutory construction—is to grant authority to obtain records in inquiries

---

[4] Similarly, under the principle of *noscitur a sociis*, words grouped in a list should be given related meanings. *Yates*, 574 U.S. at 543. Courts use this principle to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). This requires that the phrase "laws of the United States" be limited to laws related to the propriety of the importation of merchandise.

related to merchandise. So DHS's stated purpose of investigating speech critical of ICE agents, or alleged threats to such agents, is beyond the purpose of the statute and the authority granted therein.

### 3. DHS's reliance on child pornography suppression case law is unavailing.

Respondent relies on a series of Fourth Amendment suppression opinions in non-precedential child pornography cases to argue that DHS can use Section 1509 summonses to investigate "compliance with the laws of the United States" administered by DHS, not just conduct or records related to the importation of merchandise or any duties and fines. Opp. at 9. The cited discussions in these outlier cases all come in the context of alternative holdings, where the outcomes turned on the constitutional expectation of privacy under the Fourth Amendment and the applicability of the prophylactic, judicially-created exclusionary rule.[5] The persuasive authority of these cases is thus quite limited here, where J. Doe seeks to prevent violations of their ECPA rights.

Moreover, unlike the instant matter, the Section 1509 cases cited by DHS all arose in the context of investigating child pornography—prohibited contraband that is often transmitted from outside of the United States. [6] *See Cray*, 673 F. Supp. 2d at 1376–77 (S.D. Ga. 2009) (noting child pornography images with file names containing the country names of "asia" and "brasil" and depicting child victims from Poland and the United Kingdon). The international and prohibited nature of transmitting child pornography brings such investigations much closer to the purview of Section 1509(a), which targets records involving the entry of merchandise into the United States. *See* 19 U.S.C. § 1509(d)(1)(A)(ii).

The Court should thus reject DHS's invitation to leverage these cases in an attempt to expand its

---

[5] *See United States v. Barnes*, No. 20-30059, 2021 WL 4938126, at *2 (9th Cir. Oct. 22, 2021) ("We need not consider whether the issuance of the Comcast summons was permitted under 19 U.S.C. § 1509 because, even assuming a statutory violation occurred, suppression would not be the appropriate remedy."); *United States v. Merrell*, 88 F. Supp. 3d 1017, 1032 (D. Minn. 2015) ("For purposes of the Fourth Amendment, this Court concludes that Merrell lacks a constitutionally cognizable privacy interest in the records at issue."); *United States v. Wellbeloved-Stone*, No. 3:17-cr-00014, 2018 WL 1973286, at *6 (W.D. Va. Apr. 26, 2018) ("First, assuming that there was a violation of the statute, 19 U.S.C. § 1509 does not provide for an exclusionary remedy."); *United States v. McLean*, No. SA-09-CR-270, 2010 WL 376381, at *3 (W.D. Tex. Jan. 25, 2010) ("Even if the Court had determined that ICE agents had improperly relied on an administrative subpoena, the evidence discovered as a result of the execution of the search warrant would be admissible under the 'good-faith' exception to the exclusionary rule…."); *United States v. Cray*, 673 F. Supp. 2d 1368, 1376 (S.D. Ga. 2009) ("Cray has not shown any valid privacy interest that invokes the Fourth Amendment protection.").

[6] The lone exception from DHS's Opposition—*United States v. Marbelt*, 129 F. Supp. 2d 49 (D. Mass. 2000)—does not discuss the scope of Section 1509 at all.

authority under Section 1509 beyond the purpose of the statute.

**B.    DHS Cannot Establish that the Records Summoned Are Relevant and Material to an Investigation into Violations of 18 U.S.C. § 115.**

Even if Section 1509 could be used in an investigation into violations of 18 U.S.C. § 115, DHS cannot establish that the information sought is relevant and material to any such investigation. Section 115 applies to anyone who "assaults, kidnaps, or murders" certain federal officials, or conspires, threatens or attempts to do so, with the intent to impede such official's performance of official duties. 18 U.S.C. § 115. Given the fully protected content of the social media accounts in question and the paucity of the declaration submitted by Respondent, DHS has failed to meet its burden of showing that the information sought is relevant and material to a legitimate investigation.

In response to the bare and conclusory statements in the lone declaration submitted by DHS, Movant has included in Appendix 1 a copy of *all* of Movant's postings on the "MontCo Community Watch" Facebook account and the "@montcowatch" Instagram account. This Appendix, combined with the declaration of J. Doe, confirms that the purposes of the social media accounts and their posts are to inform the community of public law enforcement actions undertaken by ICE in Montgomery County, Pennsylvania, and to share information and resources about immigrant rights, due process rights, fundraising, and vigils. Doe Decl., Dkt. No. 1-2, ¶¶ 4–9. The posts contain no threat (even an arguably implicit one) to assault, kidnap, or murder any federal official. *Id.* at ¶ 9. Unsurprisingly, neither DHS nor its declarant cites any post even allegedly constituting any such threat. To the contrary, all posts on these social media accounts constitute speech addressing important public issues fully protected under the First Amendment. *See* Dkt. No. 1 at 10–15 & Section B, *supra*. The speech posted on the social media accounts in question provides no basis to allege a potential violation of Section 115; they are wholly insufficient to show that the information sought is relevant to a Section 115 investigation.

DHS relies exclusively on a two-page declaration from Special Agent in Charge Eric McLoughlin, who was not employed within the DHS Homeland Security Investigations office in Philadelphia when the Summonses were issued by the office's prior Acting SAC. McLoughlin Decl., Dkt. No. 28-1, ¶¶ 1, 2. The declaration contains only a bald assertion that Respondent issued the Summonses "after receiving information concerning the stalking and gathering of intelligence on federal agents involved in ICE operations" and that its investigation "deals with the open organization of people to impede immigration[-

]based investigations and operations." *Id*. at ¶¶ 2, 4. No other details are contained in the affidavit as to why or how the customer, owner, or subscriber whose information is sought is involved in a violation of 18 U.S.C. § 115. Reporting on, or even livestreaming, publicly occurring immigration operations is fully protected First Amendment activity. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). DHS does not, and cannot, show how such conduct constitutes an assault, kidnapping, or murder of a federal law enforcement officer, or a threat to do any of those things in violation of 18 U.S.C. § 115.

DHS's reliance on the unpublished *SEC I* is again unavailing here. Indeed, *SEC I* highlights how DHS *fails* to establish that the information sought here is relevant and material to any legitimate investigation. In *SEC I*, the governmental agency clearly identified potential criminal conduct. The SEC did not simply assert that it was investigating a fraudulent scheme. *SEC I*, 2011 WL 4593181, at *1. It provided facts demonstrating why it believed a fraudulent scheme was occurring—the SEC identified a rapid increase in the stock price of a company called Jammin Java that coincided with the wide dissemination of online newsletters touting its stock, classic signs of a "pump-and-dump" scheme. *Id*. Here, in contrast, DHS can identify no factual basis for believing that there has been a potential violation of the criminal statute identified, because Movant's social media activity is protected speech.

### III. The Summonses Chill Movant's First Amendment Rights Without Achieving a Sufficiently Important Governmental Interest.

#### A. The Summonses Implicate Movant's First Amendment Rights.

Movant's opening brief details how the First Amendment protects the rights to criticize governmental activity, to publish recordings of government officers conducting official duties in public, and to associate anonymously with others online. Dkt. No. 1 at 10–15. These rights are foundational to our constitutional order: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 462–63 (1987). As the Supreme Court has emphasized for two generations "[t]he price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power." *United States v. United States Dist. Court*, 407 U.S. 297, 314 (1972). DHS's Opposition fails to overcome these fundamental protections.

Remarkably, DHS suggests that the First Amendment does not apply at all to its unmasking summonses, asserting that "Movant has failed to address how disclosing only the subscriber information

in Meta's possession implicates the First Amendment here." Opp. at 13. But DHS does not dispute that they seek identifying information, thus clearly implicating the First Amendment rights to associate and speak anonymously—rights DHS fails to address in its Opposition.

"The First Amendment protects a right to anonymous association." *Ward v. Thompson*, No. 22-16473, 2022 WL 14955000, at *1 (9th Cir. Oct. 22, 2022) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) and *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)); *see also*, *e.g.*, *Cognosphere Pte. Ltd. v. X Corp.*, No. 23-MC-80294-PHK, 2024 WL 4227594, at *2 (N.D. Cal. Sept. 18, 2024) ("[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the contents of a publication, is an aspect of the freedom of speech protected by the First Amendment." (quoting *McIntyre*, 514 U.S. at 342)).[7] "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Ams. for Prosperity Found. v. Bonta,* 594 U.S. 595, 607 (2021) (quoting *NAACP*, 357 U.S. at 462). And this Court has similarly emphasized that "[a]s with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation ... [or] concern about social ostracism.'" *United States v. Google LLC*, 690 F. Supp. 3d 1011, 1023 (N.D. Cal. 2023) (quoting *In re Anonymous Online Speakers*, 661 F.3d at 1173 and *McIntyre*, 514 U.S. at 341–42). DHS's efforts to unmask Movant implicate this recognized right to anonymous association and chill Movant's First Amendment rights to criticize governmental activity, and to publish DHS's public exercise of their official duties, by putting Movant in fear of baseless and retaliatory persecution. *See Bonta,* 594 U.S. at 610 ("when it comes to 'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution'" (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971))).

Tellingly, DHS does not address the Supreme Court's decisions in *NAACP*, *McIntyre*, *Bonta*, or *Baird*, or any of the above authorities. Instead, DHS relies almost exclusively on the unpublished decision in *SEC I* for the proposition that a government investigation seeking "identifying information is not

---

[7] This right "applies equally to online discourse." *Cognosphere,* 2024 WL 4227594, at *2 (citing *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011)).

1    subject to First Amendment (or Fourth Amendment) protection." Dkt. No. 28 at 13 (quoting *SEC I*, 2011

2    WL 4593181, at *6). However, Judge Hixson of this Court subsequently expressly rejected the idea "that

3    the First Amendment does not protect the subscriber information of an anonymous speaker." *Jones v.*

4    *Meta Platforms, Inc.*, No. 25-MC-80165-TSH, 2025 WL 2308494, at *6 (N.D. Cal. Aug. 11, 2025); *see*

5    *also Cognosphere*, 2024 WL 4227594, at *3 ("precedent from this Court and other courts have rejected

6    the notion that there should be no First Amendment analysis in evaluating a motion to quash (or enforce)

7    a DMCA subpoena" seeking a person's identity).

8         In *SEC I*, the court cited only one Ninth Circuit case—*London v. Does 1–4*, 279 F. App'x 513 (9th

9    Cir. 2008)—to support its argument that the First Amendment did not apply to investigative efforts to

10   unmask anonymous internet users. But as *Jones* explains, the *London* court did not hold that the First

11   Amendment *never* applies to an unmasking subpoena. Rather, it held "under the facts of that case, the

12   First Amendment was not violated by release of identifying user data." *Jones*, 2025 WL 2308494, at *6

13   (citing *London*, 279 F. App'x at 515). *London* was limited to the determination that the First Amendment

14   does not "bar[] release of identifying data for email accounts used to solicit sex partners on the Internet."

15   *Jones*, 2025 WL 2308494, at *6 (quoting *London*, 279 F. App'x at 515); *see also Smythe v. Does 1-10*,

16   No. CV 15-4801-R, 2015 WL 12819173, at *2 (C.D. Cal. Sept. 25, 2015) ("assertion of anonymity for

17   fear of being connected to potentially illegal action is unpersuasive" as "a blanket shield from liability

18   under the law for all speech"). Unlike *London*, Movant does not assert a right to shield illegal conduct,

19   but rather asserts the fundamental right to be free from government intimidation and baseless and

20   retaliatory persecution for clearly lawful, First Amendment-protected association and advocacy.

21        **B.    The Summonses Cannot Survive the Applicable Exacting Scrutiny Standard.**

22        Respondent's attempt to overcome Movant's First Amendment objection is subject to exacting

23   scrutiny. *Bonta*, 594 U.S. at 607. The Court in *Bonta* invalidated a California law that required charitable

24   organizations to disclose identities of major donors to the Attorney General's Office because it "impose[d]

25   a widespread burden on donors' associational rights." *Id*. at 598. It emphasized that "[p]rotected

26   association furthers 'a wide variety of political, social, economic, educational, religious, and cultural

27   ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident

28   expression from suppression by the majority.'" *Id.* at 606 (quoting *Roberts v. United States Jaycees*, 468

U.S. 609, 622 (1984)). The Court thus held that "exacting scrutiny requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' . . . and that the disclosure requirement be narrowly tailored to the interest it promotes." *Id.* at 611 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010) (cleaned up) and citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Respondent does not address the recent Supreme Court decision in *Bonta*, instead relying on earlier Circuit Court opinions in *Dole v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459–1460 (9th Cir. 1991) and *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 (9th Cir. 1988) to argue that rational basis should apply.[8] *See* Opp. at 12. But the Ninth Circuit has since made clear that *Bonta*'s exacting scrutiny test applies to a governmental investigative subpoena. *See Ward*, 2022 WL 14955000, at *1–2. Additionally, while *Dole* and *Brock* employed rational basis, the Supreme Court cases they rely on—*NAACP* and *Buckley v. Valeo*—both applied exacting scrutiny. 424 U.S. 1, 64 (1976) (citing *NAACP*, 357 U.S. at 463). DHS's effort to compel disclosure of Movant's identity cannot satisfy exacting scrutiny because Respondent cannot show that the Summonses are directed to a "sufficiently important governmental interest." *Id.* (quoting *Bonta*, 594 U.S. at 607). Baseless and generic accusations of alleged criminal activity are insufficient to meet this standard. *Buckley*, 424 U.S. at 64 ("[w]e long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest"). Despite Movant's activity being publicly accessible on Facebook and Instagram accounts, DHS cannot show how any of Movant's activity might possibly violate federal criminal law. Thus, for the reasons described in Section II(B) above, DHS has not met its burden to demonstrate the Summonses are directed to the important governmental interest of a good faith criminal investigation.

Rather than serving any legitimate interest in investigating criminal conduct, DHS's statements both in its brief and outside of court make clear that it seeks to employ criminal investigative authority to chill Movant's First Amendment rights. In *United States v. Powell*, 379 U.S. 48, 51, 58 (1964), the Supreme Court held that a federal administrative subpoena may be unenforceable if it "would be an

---

[8] Of course, DHS's efforts to threaten Movant with criminal prosecution for exercising their First Amendment rights would not satisfy even rational basis scrutiny, because they do not represent a compelling governmental interest. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out").

abusive use of the court's process," such as if it were "issued for an improper purpose, such as to harass the [recipient]." In recent months, District Courts have repeatedly quashed administrative subpoenas issued by Federal entities for improper purposes. *See In re Subpoena No. 25-1431-014*, No. 25-mc-00039-MAK, 2025 WL 3252648, at *12 n.109 (E.D. Pa. Nov. 21, 2025) (collecting cases).[9]

Here, DHS officials' public statements demonstrate a desire to stop the public from advocating against their immigration policies by threatening anyone who is "videotaping ICE law enforcement and posting photos and videos of them online" with criminal prosecution.[10] As in the case where DOJ had failed to demonstrate how operations could possibly involve misbranding or filing false insurance claims (the stated basis for the investigation in *QueerDoc*, 2025 WL 3013568), DHS presents no evidence that Movant's First Amendment-protected social media activity violates any federal law, let alone the prohibition on assaulting, kidnapping, or murdering federal officials. As such, this Court should find that, the Summonses were issued for an improper purpose of harassing Movant to chill their advocacy, as "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." *Id.*, at *5.

### C. Movant Presents a Prima Facie Case Showing a Chilling of First Amendment Associational Rights.

To circumvent its inability to satisfy its exacting scrutiny burden, DHS tries to shift the burden by asserting that the party contesting a subpoena first "must make a prima facie showing of arguable first amendment infringement." Opp. at 12 (quoting *Doe v. U.S. S.E.C.,* 2011 WL 5600513, at *2 (N.D. Cal. Nov. 17, 2011) ("SEC II"). DHS claims Movants must "demonstrate that disclosure will result in: (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights" before this

---

[9] By way of further example, a district court in *QueerDoc, PLLC v. U.S. Dep't of Just.* quashed a DOJ subpoena to a small telehealth provider of gender affirming care for the stated purpose of investigating misbranding and false insurance claims. No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *2, *6 (W.D. Wash. Oct. 27, 2025). To assess that stated purpose, the court looked at the government's public statements, in which United States officials declared an intent to end gender-affirming care, *id.,* at *5, and considered "[t]he mismatch between DOJ's stated investigation and QueerDoc's actual operations." *Id.,* at *6. DOJ had failed to "articulate why it is investigating QueerDoc specifically," given the lack of evidence that QueerDoc could "commit the violations being investigated," *id.*, and quashed a subpoena that "serve[d] to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct," *id.*, at *7.

[10] *See infra*, note 12.

Court can begin to scrutinize the Summonses. *Id.* at 13 (quoting *Dole*, 950 F.2d at 1459–1460). But under the exacting scrutiny test subsequently announced in *Bonta*, no such showing is required.[11]

However, even if this Court were to hold that a party contesting unmasking subpoenas must make a *prima facie* case that their associational rights are objectively at risk of being chilled, Movant has made such a showing. Movant has stated that "I believe the government is targeting me because it disagrees with the content of the speech that I have posted and reposted online." Doe Decl. at ¶ 19. Movant added that "I believe that my anonymity is the only thing standing between me and unfair and unjust persecution by the government of the United States." *Id.* Certainly, the threat of "unfair and unjust persecution by the government of the United States," *see* Doe Decl., would "objectively suggest . . . [a] 'chilling' of" Movant's associational rights, *see Ward*, 2022 WL 14955000, at *1–2. *See Hartman*, 547 U.S. at 256.

Movant's fear that their associational rights will be chilled is objectively reasonable in light of Respondent's extensive and open history of hostility towards First Amendment-protected advocacy related to its immigration enforcement practices. At its highest levels, DHS officials have revealed an agency-wide intent to weaponize criminal and administrative law to put a stop to protected activities, such as taking pictures or video of ICE officers or posting such media online, asserting that such long-established First Amendment activity somehow constitutes illegal harassment or "violence."[12] Two days before DHS issued the Summonses here, DHS's Assistant Secretary for Public Affairs was reported as stating that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," and "[w]e will prosecute those who illegally harass ICE agents to the fullest extent of the

---

[11] The Supreme Court in *Bonta* "subjected disclosure requirements to exacting scrutiny without first requiring plaintiffs to establish that the disclosure will actually subject them to threats, harassment, or reprisal." *Ward*, 2022 WL 14955000, at *4 (Ikuta, J., dissenting). The Supreme Court emphasized that "[e]xacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure." *Bonta*, 594 U.S. at 616 (quoting *NAACP*, 357 U.S. at 460–461) (emphasis in *Bonta*); *id.* at 618 ("When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough.").

[12] Grace Bellinghausen, *Secretary Kristi Noem addresses surge in attacks on ICE agents in Tampa,* WBMA (Jul. 13, 2025), https://abc3340.com/news/nation-world/secretary-kristi-noem-addresses-surge-in-attacks-on-ice-agents-in-tampa-dhs-us-immigration-and-customs-enforcement-agents-florida-department-of-homeland-security-july-13-2025 (In July 2025, DHS Secretary Kristi Noem announced that "[v]iolence is anything that threatens [ICE officers] and their safety," including "videotaping them where they're at when they're out on operations").

law."[13] And the day before this brief was filed, the DHS's Office of Public Affairs again stated that following or recording a federal law enforcement officer "sure sounds like obstruction of justice" in response to which "we will hunt you down and you will be prosecuted . . . ."[14]

In addition to "informally 'enforcing' their disapproval of at-the-scene recording by shoving, beating and even shooting (with less lethal munitions) journalists, freelance photographers, and others with cellphone cameras,"[15] DHS is openly targeting people anonymously sharing videos and photos of ICE activity online. One week before DHS issued the instant Summonses, it issued an administrative "Immigration Enforcement Subpoena" to Meta seeking to unmask six other Instagram accounts, at least four of which were publishing or reposting content critical of DHS's activity in Los Angeles.[16] After account holders filed motions to quash the subpoena, asserting First Amendment arguments, DHS withdrew the subpoena targeting those accounts.[17] Given DHS's broad efforts to stop the public from engaging in First Amendment-protected challenges to its immigration enforcement practices, Movant's concerns that their First Amendment rights would be chilled by the Summonses compelled disclosure of their identity are objectively reasonable and trigger First Amendment protection even under the burden-shifting framework posited by DHS.

**CONCLUSION**

Movant requests that the Court issue an order quashing the Summonses in their entirety.

---

[13] Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is 'Violence'*, THE AMERICAN PROSPECT (Sep. 9, 2025), https://prospect.org/2025/09/09/2025-09-09-dhs-claims-videotaping-ice-raids-is-violence/.

[14] C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, REASON (Dec. 22, 2025), https://reason.com/2025/12/22/dhs-says-recording-or-following-law-enforcement-sure-sounds-like-obstruction-of-justice/.

[15] Walter Olson, *DHS Says Videotaping ICE Agents Is Illegal. Federal Courts Disagree,* CATO INSTITUTE (Oct. 9, 2025), https://www.cato.org/commentary/dhs-says-videotaping-ice-agents-illegal-federal-courts-disagree.

[16] *E.g.*, *In the Matter of Subpoena Number FY25-ELC-0105: Doe v. DHS*, No. 3:25-mc-80286 (N.D. Cal. Sep. 18, 2025); *Doe/LBRRN v. DHS*, No. 25-mc-80288-AGT (N.D. Cal. Sep. 19, 2025); *Doe v. DHS*, No. 25-mc-80284 (N.D. Cal. Sep. 18, 2025).

[17] Stipulation of Dismissal Pursuant to Rule 41(a)(1)(A)(ii), Nos. 3:25-mc-80284, 3:25-mc-80286, 3:25-mc-80288 (N.D. Cal. Dec. 8, 2025).

Dated: December 23, 2025                    Respectfully submitted,


                                           By: */s/ Jacob Snow*

                                           Jacob Snow (CA Bar No. 270988)
                                           Matthew T. Cagle (CA Bar No. 286101)

                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN CALIFORNIA, INC.

                                           Stephen A. Loney, Jr. (admitted *pro hac vice*)
                                           Ari Shapell (admitted *pro hac vice*)
                                           Keith Armstrong (admitted *pro hac vice*)

                                           AMERICAN CIVIL LIBERTIES UNION OF
                                           PENNSYLVANIA

                                           Jonathan H. Feinberg (admitted *pro hac vice*)

                                           KAIRYS, RUDOVSKY, MESSING,
                                           FEINBERG & LIN, LLP

                                           Seth Kreimer (admitted *pro hac vice*)

                                           Caitlin Barry (admitted *pro hac vice*)


                                           *Attorneys for Movant*