UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

J. DOE, )
 )
Movant, )
 )
vs. ) No. 3:25-mc-80325-PHK
 )
UNITED STATES DEPARTMENT OF )
HOMELAND SECURITY, )
 )
Respondent. )
______________________________)

San Francisco, California
Wednesday, January 14, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 2:13 - 3:12 = 59 MINUTES

APPEARANCES:

For Movant:

ACLU of Pennsylvania
Post Office Box 60173
Philadelphia, Pennsylvania 19102
BY: STEPHEN A. LONEY, JR., ESQ.

ACLU of Northern California
39 Drumm Street
San Francisco, California 94111
BY: JACOB A. SNOW, ESQ.
BY: MATTHEW T. CAGLE, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Respondent:

United States Attorney's Office
United States Department of Justice
450 Golden Gate Avenue
San Francisco, California 94102
BY: SARAH E. BALKISSOON, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/Transcriber
echoreporting@yahoo.com

Wednesday, January 14, 2026 2:13 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Now calling Miscellaneous Matter 25-80325-PHK, Doe versus United States Department of Homeland Security.

Counsel, when speaking, please approach the podium and state your name for the record. Thank you.

THE COURT: Approach and enter appearances, please.

MR. LONEY: Good morning, your Honor. Stephen Loney from the ACLU of Pennsylvania, pro hac vice counsel for the Movant J. -- J. Doe. I have with me my pro hac sponsor Jacob Snow and also Matthew Cagle.

THE COURT: All right. Good afternoon.

MR. LONEY: Good afternoon.

MS. BALKISSOON: Good afternoon, your Honor. My name is Sarah Balkissoon on behalf of the Defendant.

THE COURT: Okay.

MS. BALKISSOON: The Respondent.

THE COURT: Ms. Balkissoon, have you -- you've never appeared before me, have you?

MS. BALKISSOON: I don't think so.

THE COURT: I don't recall seeing you during criminal duty.

MS. BALKISSOON: Maybe as CMC in another case.

THE COURT: Okay. Okay. All right. Mr. Loney, why don't you approach the podium.

MR. LONEY: The fact that there are two podiums, it escaped my notice, sorry, your Honor.

THE COURT: Okay. So, you're the Movant. What's -- what do you want to say today?

MR. LONEY: Sure. I mean, it's -- what we have to say is largely summed up in our briefs and in the attachments to those, but just to emphasize a few key points, finding in favor of the Government here would allow government agencies to run rough -- roughshod over the First Amendment and their own limiting statute in order to -- to pierce the veil of unanimity, which is crucial to --

THE COURT: Anonymity, not unanimity.

MR. LONEY: Sorry, anonymity. I did that in writing too. Sorry about that, your Honor -- and to target people whose speech they -- they just don't agree with. I mean, it's beyond legitimate dispute that -- that citizens have a First Amendment right to criticize the government, to do so anonymously, to anonymously associate and to publish information about government activity that's being conducted in public. And -- and those rights are universally recognized in the case law that both sides have cited to. The Government doesn't actually claim that there's no First

Amendment right that the Movant here holds, but they're -- they're asserting this unprecedented authority for the very agency that the Movant is criticizing anonymously to unmask the anonymous posters and all in service of some amorphous investigation under a statute that relates to importation of merchandise. And all the while, the DHS leadership -- and this gets to, to the extent that we have any burden here to show a chilling effect or -- or to confirm the fear that our -- our client has attested to in the declaration, you need look no further than DHS leadership. For the past year and even up to this day, continuing to tell on themselves, to state that for people exactly like our clients, they are going to target, they are going to punish people who anonymously do nothing more than shine a light on the type of government activity that DHS would rather perform in shadows.

The Constitution doesn't tolerate this kind of strong-arm tactic and intimidation. And before even getting to the constitutional implications here, your Honor, you can decide this case on statutory grounds alone, that Section 1509 simply does not authorize this kind of subpoena. 1509, as the DHS's own Inspector General confirmed, has to do only with importation of merchandise.

I can go on, your Honor. We do go on in our briefs, but I figured I'd stop there for -- for questions if you

have any.

THE COURT: Stepping back a little bit, I didn't see this in any of the briefing. Has any court in the country denied a motion to quash a similar subpoena or -- or summons?

MR. LONEY: Denied a motion to quash this kind of subpoena or summons? Not to our knowledge, your Honor. In fact, the -- the record is pretty one sided in district courts that -- that these kinds of abuses have been -- have been quashed.

THE COURT: What about a summons under 1509?

MR. LONEY: 1509, your Honor, there were I think four cases teed up before this Court in late 2025, and the DHS actually withdrew all of those subpoenas before having to defend them in court. So, we haven't gotten a court to call balls and strikes on that yet.

THE COURT: Is mine the only one that's still pending?

MR. LONEY: As far as I know.

THE COURT: Ms. Balkissoon?

MS. BALKISSOON: I'm not certain off the top of my head, but I can report back about that.

THE COURT: Lucky me. Okay. Same flip side question to you, the Government. Has any court in the country granted a motion to quash a 1509 summons such as --

similar to what's at issue here?

MS. BALKISSOON: In -- in my research, I've found that courts had enforced the summons, but in the motion to quash -- quash posture, I didn't find any.

THE COURT: Okay.

MR. LONEY: Also, your Honor, in -- in looking at any other cases that involve 1509 summonses, any that were allowed to proceed past a motion to quash were not -- I think to your question, your Honor, I heard a similar summons under similar circumstances, and we've not seen any of those approved. And, again, an earlier example of this from 2017 was the Twitter case that also was withdrawn before a judge got a chance to rule on it.

THE COURT: Okay. Well, before this Court expends resources actually ruling on this, have the party -- are the parties discussing withdrawal or -- or resolution of this one before -- before I do anything or is that -- is it really going to recall me to call a ball a strike here?

MS. BALKISSOON: The parties have not discussed this, and we don't have a present intention to discuss that right now.

THE COURT: Okay.

MR. LONEY: I'll say we're open obviously to the Government withdrawing its subpoena, but, you know, unmasking our anonymous poster is a bright line that we

can't negotiate on.

THE COURT: All right. Now, I've done this through text orders and you still have to -- you converse, and Meta is not intervening here. They're not -- they're just waiting to see what happens.

MR. LONEY: Unfortunately not. They -- they've not done anything in court to stop this train.

THE COURT: Okay. Ms. Balkissoon, has the Ninth Circuit ever interpreted 1509 to reach documents other than those related to tariffs, customs, importation, exportation, that kind of thing?

MS. BALKISSOON: I don't have a case off the top of my head.

THE COURT: Okay. Has the Supreme Court ever interpreted 1509 to reach documents or records beyond the scope of things related to tariffs, customs, imports, fines and duties?

MS. BALKISSOON: I don't know one off the top of my head, your Honor.

THE COURT: Okay. Have any other District Courts in the Ninth Circuit reached that interpretation of 1509?

MS. BALKISSOON: I don't have one off the top of my head, your Honor.

THE COURT: All right. Well, nationwide, is there any authority from any court persuasive or otherwise that

would support your interpretation, the Government's interpretation of 1509 to reach records that go beyond customs, duties, imports, et cetera?

MS. BALKISSOON: Yes, your Honor. There was a case we cited in our brief that -- where the Court held that the language in 1509 was not limited to the traditional customs context. It was outside of -- of this Circuit. It -- I have to find that one.

THE COURT: Is that one of the child pornography cases?

MS. BALKISSOON: Yes, it was.

THE COURT: Okay. But, again -- well, let me respond to that. I know -- I saw your argument in the briefing to try to distinguish it. Which case were you citing?

MS. BALKISSOON: I think it was Bonavits (phonetic).

MR. LONEY: Yeah. And I'll help out a little bit here. I think there were three or four child pornography cases that fit the same category, and we did respond to them in our reply brief, and the primary basis for distinction there is that those cases actually didn't turn on 1509. They were cases about Fourth Amendment rights and whether there's a sufficiency of evidence to -- to move forward separate from the 1509 question. So, the 1509 commentary in

those cases was dicta. And, even then, the child pornography context is just plain different. You actually could find a statutory hook. I -- I think it's a stretch as a -- as a First Amendment lawyer, but it's just meaningfully different in that child pornography, as the U.S. v. Cray (phonetic) case, one of these cases that counsel's referring to, acknowledged often involves the transporting across -- across international lines of banned paraphernalia, and 1509 in its description of what types of records are subject to subpoena or examination includes a provision for unlawful material.

We don't have any even allegation in this case that -- that Marco Community Watch or anybody involved with that organization has imported or exported banned paraphernalia.

I do also want to -- as your Honor's asking about sort of the -- the scorecard here around the country, I just want to clarify my earlier comment about the Northern District of California cases withdrawn. The Twitter one from 2017 was, as far as I know, the first 1509 attempt that was withdrawn. Before that were withdrawn in late 2025, those were not 1509 cases, but they were otherwise similar in facts.

THE COURT: Okay.

MS. BALKISSOON: And, your Honor, I just wanted to correct, there was a Western District of Washington case, the United States v. Barnes case that held that the plain

language of 1509 grants the -- grants ICE the authority to issue these subpoenas outside of the Customs context, rejected an argument about the similar argument here.

MR. LONEY: And I --

THE COURT: Mr. Loney?

MR. LONEY: I'm just not sure that's a fair reading of the case. I think it, again, falls into that category where any discussion of 1509 is dicta in a case about --

MS. BALKISSOON: And it was a child pornography case, yes.

MR. LONEY: -- about the 14th -- I'm sorry -- the Fourth Amendment, and it was also a child pornography case. So, everything I just said about sort of how meaningfully different that context is.

This, frankly, is -- this case against the Doe Movant here is at -- beyond the extreme, right. So, I would regard those child pornography cases as at the line, right, based on the facts in that case and also the alternative basis for the Court's ruling to approve the Government's searches in that case -- or in those cases. That's right at the line.

To go after people who are doing nothing more than reporting on the activity of a government agency that's being done out in the open, right, and -- and to kind of take this statute that's about importation of merchandise,

find a little catchall in there and -- and try to drive a truck through it to target our clients with investigation by the Government is just well beyond the pale.

THE COURT: Does the Government concede that if the Court were to interpret 1509 to be limited to Customs related documents broadly speaking, that the summons should be quashed?

MS. BALKISSOON: No, we're not prepared to concede that right now.

THE COURT: Okay. What's -- what would -- even if the Court were to interpret 1509 as so limited, what would -- what would be left of the summons not to quash?

MS. BALKISSOON: Well, this investigation involves threats to officers that, depending on, you know, what -- the details of the investigation were communicated at some point and may involve transmission or cross lines, I -- I'm not prepared to concede that at this moment. It would not apply if the subpoena were eliminated to the importation or Customs context.

THE COURT: Okay. I'm not asking you to concede that, but I'm asking you whether you would or not, but that's not really my question. If you're not -- if the Government's not going to concede that, what is left of the summons if the -- if the summons and the statute are so interpreted?

MS. BALKISSOON: I'm sorry, your Honor. What do you mean what is left of the summons?

THE COURT: I mean if you're not going to concede it, then you must have some theory as to there's something remaining to enforce in the summons, right, to seek that's -- that's somehow within the scope of --

MS. BALKISSOON: Yeah, yes.

THE COURT: -- the statute as -- as interpreted that way. What is that?

MS. BALKISSOON: Yes, that this -- this investigation and the subpoena for records from a communications provider is within the scope of traditional Customs duties if the Court's interpretation was to limit the scope that way.

THE COURT: Well, I think your concession that there are no cases using 1509 to go after subscriber information undercuts the theory that there -- that this is traditional Customs enforcement, doesn't it?

MS. BALKISSOON: Even though there's no cases to support, your Honor, that position -- that may be the position if your Honor took that perspective.

THE COURT: Okay. All right. So, you made reference to an investigation that Customs is undertaking. From the briefing, the investigation cited as enforcement of a criminal statute with regard to statements or I think

threats to -- to government officers.

Does ICE -- does DHS have standing? Is that the agency that enforces that statute?

MS. BALKISSOON: This is one of the statutes that ICE administers in its duties, yes.

THE COURT: Where -- correct me if I'm wrong. I thought the Justice Department enforces the criminal laws of the United States, the criminal violations.

MS. BALKISSOON: The agency -- agency's position is that it's within their power to investigate threats to its own officers or impediments to their officers.

THE COURT: The statute says laws of the United States administered by the Customs Service. Administered, I mean, that's prosecution, isn't it?

(No response.)

THE COURT: I mean, normally, if there's a criminal statute out there, agree that DOJ is the department -- or the U.S. Attorney's Office is the department that -- that enforces those laws or administers those laws, right?

MS. BALKISSOON: The Agency's position is that for -- for threats to its officers or threats to the duties of its officers, that it has the power to investigate this.

THE COURT: Is there any Supreme Court or Ninth Circuit authority in support of that position?

MS. BALKISSOON: Not that I know off the top of my

head, your Honor.

THE COURT: Is there any Northern District of California authority in support of that position?

MS. BALKISSOON: Not that I know.

THE COURT: Okay. Is there any nonbinding authority elsewhere in the country that supports that position?

MS. BALKISSOON: Not that I know of, your Honor.

THE COURT: Okay. Well, Mr. Loney, what's your view on the statute that -- the criminal statute that they're trying to administer here?

MR. LONEY: Yeah. I mean, just zooming out a little bit here, one of the troubling things about this case is I think it's DHS's position that they have the ability to do anything. But, as your Honor pointed out, that there's no basis for determining that ICE or DHS has any responsibility to administer Section 115 of the Criminal Code.

One other thing I just need to address in -- in the discussion is the statement that this case involves threats to ICE officers. Based on what we've read in the papers and what's been submitted to this Court, no, it doesn't. There's not been a single threat to federal officers identified, even something that could be interpreted as a threat. We -- we've put before your Honor every single post

of the Marco ICE Watch -- or, sorry -- the Marco Community Watch Facebook and Instagram accounts, and there's not a single threat to be found in there.

So, the fact that DHS is trying to piece together, right, they're issuing a 1509 summons and trying to tie that in with an investigation of potential violations of Section 115 of the Criminal Code, which it does not administer -- and, by the way, Section 115 of the Criminal Code specifically prohibits assaults, kidnappings or murder of federal agents or a threat to do any of those things. And nobody has yet to identify nor could they any threat to do any of those things. I mean, this is just trying to bootstrap on bootstraps. And, again, it's just far beyond the pale and unprecedented.

MS. BALKISSOON: Your Honor?

THE COURT: Yes.

MS. BALKISSOON: If I may respond to that. This is -- the Agency has never said that the posts on this account are the extent of the potential violation of this statute. This subpoena was issued to a user who was implicated in investigation related to threats that are a potential violation of the statute and impediments to the duties of these officers.

So, it is a red herring to review the posts on this site. That is not -- and it is not -- there is no duty of

the Agency to prove a violation before being able to even investigate whether there was a violation. That's not part of any of this analysis.

MR. LONEY: But it does need to have some basis to withstand exacting scrutiny or really any scrutiny. It has to show that there's some relationship to a legitimate investigation, and all we have to go on is a declaration of an agent who said nothing more than he's received information, from where we don't know, about "stalking and gathering of intelligence". I'm not seeing anything about information about threats to assault, kidnap or murder ICE agents, right. So, you know, I -- another troubling thing about this case and about trying to do this through Section 1509 is that Section 1509 is an administrative subpoena authorization, a limited one, right. And if there's really a crim -- a crime to be investigated here, there are other ways to do that. And I'm sure, your Honor, if you had seen this declaration submitted as a probable cause affidavit in support of a warrant, this would have been insufficient, right. There are guardrails in place to protect people and their rights in criminal investigations and also mechanisms the government can take advantage of to conduct legitimate investigations and also mechanisms the government can take advantage of to conduct legitimate investigations into alleged crimes. But there's just nothing on this record to

indicate that that's what's happening here. And, instead, we're trying to sidestep the mechanisms with all of their guardrails available for criminal investigations and do it through an administrative subpoena under a statute that's about importation of merchandise.

THE COURT: So, that raises the question why didn't DHS ask the Department of Justice or the U.S. Attorney's Office to try to get a search warrant for this information?

MS. BALKISSOON: This is the early stages of an investigation, your Honor, and I don't -- I don't have an answer to that question specifically.

THE COURT: All right. You are an employee of the Department of Justice, and you've been very careful to say that it's the Department of Homeland Security's position. Does the Department of Justice take a position on the reach of Section 1509?

MS. BALKISSOON: I -- I'm -- I'm not -- I'm not authorized to speak on behalf of the Department of Justice separate from advocating for my client, the Department of Homeland Security, your Honor.

THE COURT: Has the Department of Justice ever, aside from what I'm asking you to say today, has the Department of Justice itself as an agency taken a position on the scope and interpretation of 1509?

(Pause.)

MS. BALKISSOON: As it pertains to ICE -- HSI, no. No.

THE COURT: Okay. Are you aware of any statement by anyone on behalf of the Department of Justice saying that, Yes, we lack authority to administer Section 18 U.S.C. -- was it 1115 -- I've got to check on the statute.

MR. LONEY: 115.

THE COURT: -- 115 and only DHS has the -- that authority?

MS. BALKISSOON: No, I'm not aware of that at this time.

THE COURT: Or -- or DHS has concurrent authority? Have they ever acknowledged that?

MS. BALKISSOON: No, I'm not aware of that.

THE COURT: Okay. Clarify for me, because there was -- there was argument back and forth in the briefing, is DHS's position that the summons was trying to invoke Section (a)(1) or (a)(2) under 1509? You're trying to make an examination of records here or actually production of records here?

MS. BALKISSOON: Your Honor, our position is that we were invoking (a)(1) of the statute which -- which permits the examination of records and is not limited in its plain text to importation or duties or -- or any of the

things that Movant would like the Court to read into the statute. And the -- even -- and the text of the statute permits the examination of records, but it also permits the production of records.

If you look under -- if you look to provision 1509(a)(1)(A), it provides an explanation related to the production of records. It says:

> "If such record is required by law or regulation for the entry of the merchandise, it shall be provided to the Customs Service within a reasonable time after demand for its production is made."

There -- so, 1509(a)(1) does contemplate the production of records. And it wouldn't really make any sense to have a statute that permits the examination of records but no way to get the records at all.

The -- the provision that Movant is referring to, (a)(2), is about summoning someone for testimony and the production of records. It's a -- a different thing than what's done here.

THE COURT: Do you agree with that interpretation of (a)(1)?

MR. LONEY: No, your Honor.

THE COURT: Okay. Why not?

MR. LONEY: Well, in the first instance, I had answered one of your questions to opposing counsel which is DHS has taken a position on all of this through its OIG and issued a report stating that based on the language of the statute -- so, this isn't something we're reading into it. This is something the DHS OIG found in the language of the statute, that it has a limited scope of third party summonses for record pertaining to prohibited merchandise, and I think counsel just read off the definition of records that is limited to merchandise, right.

So, if you look at the -- the actual language of the statute, this parsing of (a)(1) and (a)(2), both of them refer to records, as counsel noted. And there's a definition of records under the statute which is in Subsection (d), and that -- that definition has two parts. And this is -- everything I'm saying is aligned with the OIG's interpretation as well.

The definition is limited to, number one, records required to be kept under Section 1508. 1508 is limited to records pertaining to the importation of merchandise.

Second part, any records "which are -- which there is probable cause to believe they pertain to merchandise, the importation of which into the U.S. is prohibited". And when I mentioned before that there might be a little -- a -- a hook here for the child pornography cases, I think -- I

think, if anything, that might be it, but that's not what we're dealing with here. In either case, there are two definitions of what a record is for the purposes of Section 1509.

So, when DHS refers to their ability to either inspect or request records, you look to Subsection (d) for what a record is, and you find that it is limited to records pertaining to merchandise.

There's no basis for -- for -- for concluding that the definition of record under (a)(1) is different from the definition of records under (a)(2). And, by the way, even if there is, so, there's a parenthetical about the form of records in (a)(1). Even if that were somehow read to be different than or -- or larger than the definition of records in Subsection (d), (a)(1) is about inspection, live inspection, not a summons.

So, we're dealing with a motion to quash a summons. The only thing authorizing a summons is (a)(2). So, the Government cannot point to (a)(1) as a basis to issue a summons. And, by the way, I'll lob in a hypothetical here. If the government were going to try to inspect under (a)(1), Meta wouldn't be allowed to disclose the records -- records at inspection because of the ECPA. You need a subpoena.

THE COURT: Yeah. Right. Okay.

MS. BALKISSOON: Your Honor, if I may --

THE COURT: Yeah, respond to that.

MS. BALKISSOON: -- respond? The Agency disagrees. The definition for records in (a)(1) is in (a)(1). And it permits records outside of the merchandise context, and in addition, even -- even if you accept Movant's argument regarding the legislative history and that when the statute was first crafted, it -- this catchall provision was intended to facilitate importations, in 2002, the Department of Homeland Security abolished the Customs Service and moved all of the duties and authorities to the Department of Homeland Security. So, at that point, Congress certainly authorized the -- the duties and authorities of the Customs Service to belong to DHS. So, in that way, even if it was limited at some point, it -- it was not limited after 2002.

THE COURT: So --

MR. LONEY: And that OIG opinion was 2071.

MS. BALKISSOON: And, in response to the OIG's opinion, the Agency's position is that has to do with CPB (sic) and not this agency here, which is ICE, HSI.

(Pause.)

THE COURT: Well, okay, but they're all under DHS now, right?

MS. BALKISSOON: Right. The -- it's a separate office with different authorities and --

THE COURT: Do you have any authority that an Agency Inspector General report with regard to one part of the Agency somehow doesn't apply to the entirety of the Agency?

MS. BALKISSOON: That's the Agency's position here.

THE COURT: Okay. But DHS has never formally withdrawn or abrogated that OIG report, right?

MS. BALKISSOON: Not that I know of, your Honor.

THE COURT: All right.

MR. LONEY: Nor have they parsed it in the way that it's being parsed today.

THE COURT: Okay. I'm going to read the statute to you if you've got (a)(1) in front of you. So, the government -- the government may -- at the end of the day, may, one, examine or cause to be examined upon reasonable notice any record -- and that's a parenthetical -- described in the notice with reasonable specificity which may be relevant to such investigation or inquiry.

What is such investigation or inquiry referred to goes back to the top of (a). It says in any investigation or inquiry conducted for the purpose of ascertaining the correctness of an entry, for determining the liability of any person for duties, fees and taxes due or duties, fees and taxes which may be due to the United States.

So, why isn't the word "record" in (a)(1) limited to the phrase "relevant to such investigation or inquiry"?

(Pause.)

MS. BALKISSOON: Apologies, your Honor. Can you rephrase that question? Are you saying why -- why isn't --

THE COURT: Well, let me -- let me ask a leading question then. Is it -- isn't it true that the word "record" in (a)(1) which you're relying on is modified by the phrase "which may be relevant to such investigation or inquiry" where we know what the investigation or inquiry is by the Section (a) I read, which is investigation and inquiries regarding the correctness of entries -- entries, duties, fees, taxes, et cetera?

MS. BALKISSOON: Well, our position is that the investigation or inquiry may be also an -- any investigation conducted for ensuring compliance with the laws of the United States.

THE COURT: But it says "such investigation or inquiry". It doesn't say any, and it says "any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, determine liability of any person for duty". I mean, it defines what the investigation or inquiry is that the such investigation and inquiry is referring to, doesn't it?

MS. BALKISSOON: Perhaps -- I -- I see it as an

investigation including other investigations that are regarding ensuring compliance with the laws, that it's referring up to that as well, included in those such investigations. Maybe I'm missing -- I'm missing it. Apologies, your Honor.

THE COURT: All right. What's Movant's view on that interpretation?

MR. LONEY: Sure, your Honor. I think by trying to isolate that or for ensuring compliance with the laws of the United States administered by the United States Customs Service, there are a couple of problems with that. One is, as your Honor already noted, this is -- Section 115 of the Criminal Code is not a law administered by the Customs Service or its current form of DHS.

On top of that, I mean, the interpretation here is -- you know, it's the classic elephant in a mouse hole, right, and it -- it assumes or presumes that Congress intended to list these very specific things that the Customs Service is allowed to investigate and then totally obliterates that specificity with this little mouse hole of a catchall, and hiding behind the mouse hole is the elephant of DHS being allowed to do whatever it wants to do as long as there's a law on the books that they can point to regardless of whether or not they actually administer that law. It just -- it's -- it's contrary to the laws of statutory

interpretation which we've walked through in our briefing, your Honor.

THE COURT: If the phrase "for ensuring compliance of the laws of the United States administered by the U.S. Customs Service", if that phrase covers the kind of investigation that the government's asserting here as well as any other type of investigation covered by laws administered by the Customs Service, isn't the rest of the preamble in Section (a) superfluous?

MS. BALKISSOON: No. Your Honor, my understanding is that when Congress drafted this, they did intend this last portion to be a catchall, a term that Movant keeps using.

At the time, the Customs Services duties may have been focused on importation, but I'm -- but I read this to see that Congress intended their duties to -- to keep a catchall here for other laws administered by the Customs Service. Now, after 2002, there are additional laws that the Customs Service administers.

So, I don't see that as superfluous. It's an intentional catchall.

MR. LONEY: It's no more intentional than Congress intended to include fish in the definition of records in Sarbanes-Oxley, and that's the situation that -- that the Supreme Court in Yates addressed and walked through exactly

the statutory interpretation canons that we're asking the Court to walk through today.

MS. BALKISSOON: But, your -- your Honor, Movant is asking for the exact opposite. Movement -- Movant is asking for this Court to decide what is not included in this and -- and read in language that is just simply not here. The statute doesn't say an limited to this certain context. It -- it clearly says for ensuring compliance with the laws administered by the Customs Service. Congress could have put a limitation in there, and Congress did not.

So, if we accept Movant's position, we have to decide what Congress intended to exclude from this.

MR. LONEY: All we're presenting is exactly what the OIG said, which is Congress intended a limited universe, and everything outside of that universe you have to find another way to get this information. And -- and that's consistent with the statutory terms. We keep going right past administered by the United States Customs Service in talking about Section 115. So, even if there is a -- a broader scope encompassed by this line than what's in the previous few clauses, it still can't reach Section -- an investigation of violations of Section 115.

And, finally, your Honor, even if you were to accept this interpretation of the first paragraph of Subsection (a), you still have to get to, you know, even if this were

the type of investigation that DHS were authorized to perform, you get to Subsections (1) and (2) to define what they are allowed to do in service of that investigation, and that gets us right back to the discussion of records that we had earlier today and that -- that we laid out -- laid out in our briefs. So, all they're allowed to do is either examine or request records or summon testimony, and when you are talking about the summonsing of records, those are clearly defined to relate to importation of merchandise.

So, this is not us -- we shouldn't have to try to prove a negative of what Congress didn't intend. What Congress clearly did intend, which OIG agreed with, is a limited scope, and this summons, this investigation is outside of that limited scope.

THE COURT: Are there any Customs or DHS regulations promulgated pursuant to 1509 that did shed light on what the scope of record means?

MS. BALKISSOON: Not that I know of off the top of my head, your Honor.

THE COURT: Mr. Loney?

MR. LONEY: Not that we're aware of.

THE COURT: Okay. You know, I -- I do -- this is more of a procedural matter, but I read the summons, and it does say requiring -- requiring production of documents. It doesn't say for examine -- it doesn't say time -- it's -- it

gives a date for -- and a location to which to produce documents.

If it were truly trying to invoke the authority under (a)(1), it would set a date for examination of records at Meta's facility. That's what examination is, right?

MS. BALKISSOON: The Agency's position is that examination includes the production of records. It's not just examination of records, having to travel to the facility and look at them.

THE COURT: Doesn't that make (a)(2) superfluous then if (a)(1) already covers production?

MS. BALKISSOON: No, your Honor. (a)(2) is focused on summoning a person to produce records or a person to provide testimony. So it serves a different purpose.

THE COURT: We know under normal statutory interpretation and -- I mean, person includes a corporation, right. So, it -- I don't understand. If (a)(2) covers summoning, which this is your -- this is a summons, right? It's titled summons, right? Summoning a corporation to produce documents, that's -- that's what it says here, right? I'm looking at the face of the summons. It doesn't say, you know, here's the date and time for us to come and examine your records.

(Pause.)

MS. BALKISSOON: That -- that's what the -- the

summons says, but it doesn't -- it doesn't make sense to have the examination of records prohibit the Agency from being able to obtain the records.

THE COURT: Well, sure. (a)(1) -- I mean, civil litigation, you can -- you can do an inspection or you can ask for the production. It's your choice, right? And you chose to draft a summons that's asking for the production -- on its face is asking for the production of documents, you know, at HSI's location, right?

MS. BALKISSOON: I mean, the Agency's position is that it -- that it's authorized by -- by (a)(1) the production of --

THE COURT: Would you agree that the summons as drafted is asking for the production of documents and not giving reasonable notice of a request to examine documents?

MS. BALKISSOON: It -- it requests the production of documents, yes.

THE COURT: Okay.

MR. LONEY: Your Honor, may I just --

THE COURT: Yeah.

MR. LONEY: -- just, lest we inadvertently encourage DHS to issue a different summons for -- to appear and inspect records, the statute -- reading the statute as a whole still limits all of the above (a)(1) or (a)(2) to records as defined by records pertaining to importation of

merchandise.

So, the same limitation on records applies to the entire statute as, again, I keep beating this drum, but it's an important one, that's exactly how OIG read it just a couple of years ago.

On top of that, Meta as a provider of Internet communications services may only provide these kinds of records, whether it's in person or pursuant to a summons, under a valid statutorily authorized subpoena, which this is not for all the reasons we've been talking about. And in neither -- an identical thing with a date to show up and get the records in person would also fail all of these tests for a valid summons under the ECPA.

THE COURT: Would Movant agree that if the Court were to find that the summons is invalid under the statute, that the Court need not reach either the First Amendment or the SCPA ECPA argument?

MR. LONEY: Sir, as a matter of constitutional -- based on what's in front of you, I -- I think that's right. You could rule just on statutory grounds, but this conversation we're just having gives me a little bit of pause about, again, encouraging DHS to try another avenue that we already know is foreclosed, and it's foreclosed for all the statutory reasons we've been talking about, and it also presents the same First amendment issue. So, if there

is no basis for surviving exacting scrutiny on this summons, the same would be true of any other attempt under 1509 to do the same thing under the same circumstances.

(Pause.)

THE COURT: Okay. Well --

MR. LONEY: But I -- I --

THE COURT: -- presumably, the -- the government understands their Rule 11 obligations not to pursue frivolous motions practice, correct?

MS. BALKISSOON: Yes.

THE COURT: Okay. I think you touched on it, but, I mean, again, looking at Section 1509(d), right, and it -- it says for purposes of this subsection, and it gives the definition of records. So, I know your position was that Section (a)(1) gives the definition of records, but (d) says for purposes of this subsection, it gives the definition of records.

So, why doesn't (d)(1)'s definition apply?

MS. BALKISSOON: Our position is that each definition applies to the subsection it's in. So, the definition in (1) applies to (1), and the definition in Subsection (d) applies to that subsection.

MR. LONEY: Can I?

THE COURT: Yes.

MR. LONEY: Subsection (d) also includes -- it

goes on. It's -- there's Subsection (d)(1)(A) which your Honor is referring to.

THE COURT: Yeah.

MR. LONEY: And then there's Subsection (d)(1)(B) --

THE COURT: Yes.

MR. LONEY: -- which define the summons. And a summons is a summons issued for any records, which this is, right. So, even if we're trying to sort of isolate each subsection in this way and (d) is its own thing, which I think also would violate the -- the canons of statutory instruction that requires courts to read the statute as a whole. But if we're really zeroing in at this level, even that definition of records applies to summonses for records, and this is a summons for records.

THE COURT: Response to that argument?

MS. BALKISSOON: That -- I mean, I would just reiterate what I've already said about the -- the definition of records in (1) applying to (1). And to briefly address the ECPA argument --

THE COURT: I'd prefer you go to --

MS. BALKISSOON: Okay.

THE COURT: -- why doesn't the definition of summons in (d)(1)(B) apply throughout the statute?

MS. BALKISSOON: Well --

THE COURT: Because there's nothing in (A) that defines summons, right?

MS. BALKISSOON: Right. But the power in (A) gives the Agency the authority to examine records, and even though the -- the -- they titled these summonses, it's the same -- it's the -- it's a subpoena. It's the same -- it's a device to get the production of records.

THE COURT: That's not my question. It says summons -- in (d)(1)(B), it says summons means any summons issued under Subsection (A) which requires the production of records, right. And -- and then it refers back to records under (d)(1). So, why -- why doesn't summons as used in the statute as a whole mean what it says here in (d)(1)(B)?

MS. BALKISSOON: Well, I think summons applies. If the -- the issue is that because one has its own definition of records, that's why --

THE COURT: Yeah, but (D)(1)(B) incorporates -- even taking your argument at face value, the -- (d)(1)(A)'s definition of records only applies to (d)(1) -- to (d) itself, (d)(1)(B) incorporates that definition of (d)(1)(A) for records, which then defines records in (a), 1509(a), right?

(Pause.)

MS. BALKISSOON: I'm not sure I'm exactly following, but --

THE COURT: I think this is in the briefing, right. I mean, look, (d)(1)(B) gives the definition of summons which specifically refers to summons as used in Section -- Subsection (A), right, and (d)(1)(B) in its definition of summons incorporates by reference the definition of records in (d)(1)(A), right, which, as has been pointed out, is everything under 1508, which is customs and duties and fines and those things.

So, there's no special definition of the word "summons" in Section (A), and the definition of summons in (d)(1)(B) refers to Subsection (A), right. So, why doesn't the definition of summons here apply to Section (a), which then brings in the definition of records as well?

MS. BALKISSOON: Well, because even if you brought in the definition from (d)(1) for -- for the definition of records, which is incorporated in that --

THE COURT: Yeah.

MS. BALKISSOON: -- this specific language in (1) trumps it.

THE COURT: Trumps it? Okay. Do you have any legal authority to support that?

MS. BALKISSOON: No, your Honor.

THE COURT: Okay.

MS. BALKISSOON: Not at this time.

THE COURT: All right. Okay. Have I understood

your logic on that correctly, Mr. Loney? I want to make sure.

MR. LONEY: Yeah. I think the -- the questions track sort of our interpretation and reading of the statute, your Honor.

THE COURT: All right.

(Pause.)

THE COURT: All right. You wanted to talk about SCPA.

MS. BALKISSOON: Yes. I just wanted to briefly say that another reason to interpret this statute by reading the plain text of it is because if you interpret it the way that movement -- Movant advocates for, to allow for the examination of the records and not -- and then under the ECPA not be able to obtain any records, it makes this provision a nullity. Essentially, it would allow for the examination of records that couldn't be examined. So, I think that supports interpreting the statute to give meaning to this provision.

MR. LONEY: They just can't examine information pertaining to a subscriber or customer of the provider of remote computing services without a valid subpoena, right. So, there's a -- only a small door that -- that DHS can't walk through if we're interpreting this under the ECPA rubric. And, again, if there's a legitimate criminal

investigation, there are other ways to get at this information if DHS or -- or DOJ is able to substantiate their requests and overcome the First Amendment concerns, which would -- First Amendment concerns would be present no matter what avenue the Government tried to take here. But, as to ECPA, applying ECPA does not render Section 1509 a nullity. If there -- if there is a company that is importing merchandise, not a provider of remote computing services, ECPA doesn't have anything to say about that. We're only referencing ECPA because DHS is trying to stretch its authority into seeking non-importation information from providers of computing services, and they're triggering all of these other statutes and limitations by doing that.

ECPA, I -- I would agree ECPA does not render Section 1509 a nullity. It just means that DHS -- it's one of the many reasons DHS can't do what it's trying to do here.

THE COURT: Does the argument go a little too far? Because it isn't that the government can't get that information. Under 2703, if you get a valid warrant, you can get the information, right?

MS. BALKISSOON: Right, but you wouldn't be able to examine the records if you accept Movant's interpretation where examination is just examining the records. Its power isn't -- is -- is nothing, the power. It's -- it doesn't do anything.

THE COURT: Well, you can get records on -- I think they're conceding you can get records on importations and duties and fines and -- and exports, right? I mean, kind of traditional trade related customs stuff. It isn't a nullity. You can get some records they're saying, just not the ones -- the type that you are seeking.

MR. LONEY: The type they're seeking from the entity.

THE COURT: Right.

MR. LONEY: The type of entity they're seeking it from.

MS. BALKISSOON: And the -- the Agency takes -- I mean, it's -- that limitation just isn't in the statute. So -- and it -- it completely ignores the fact the Customs Service was abolished in 2002. So, that -- that was an authorization from Congress that this catchall applies to the new Customs Service, which is DHS.

THE COURT: Well, if you're saying the Customs Service doesn't exist anymore and, therefore, the statute doesn't apply, then --

MR. LONEY: Then it has no authorizing statute.

THE COURT: Then it has not authorizing -- because the statute at the top says -- it only refers to the Customs Service, right? If you're saying reference to the Customs Service makes the statute a nullity, that -- that defeats

any authority under the statute because it only refers to administered -- laws administered by the Customs Service.

MS. BALKISSOON: What I -- what I'm saying is not that it's not -- I'm not saying that it's a nullity in that way. I'm saying that it ignores -- the interpretation it is advocating for ignores the authorization Congress gave in 2002, which is, in my opinion, staring us in the face when we read United States Customs Service, knowing that that was transferred to Department of Homeland Security, the duties and -- and authorities of the Customs Service. So, that -- that's what my point was, your Honor.

MR. LONEY: As a general matter, your Honor, I would agree that DHS inherited all the -- the duties, authorities, and limitations under the statutes that predate its creation. Otherwise, going back to ECPA, the only way that an agency can get subscriber information from a provider of remote computing services or electronic communication service is through a subpoena that is statutorily authorized. So, if the statutory authorization went away in 2002, then I suppose DHS would be out of luck under ECPA to get emails and identities of anonymous Instagram subscribers.

THE COURT: Are you arguing that they lost their authority in 2002?

MR. LONEY: No, and I don't think we need to.

THE COURT: Right. Okay. Okay. Anything further on the Stored Communications Act or ECPA?

MS. BALKISSOON: No.

THE COURT: Okay. Any rebuttal on that?

MR. LONEY: No, your Honor.

THE COURT: Okay. I think I've covered everything -- every question the Court had. The -- give the Movant -- I'll give the Movant the last word. So, Ms. Balkissoon, you go first.

MS. BALKISSOON: Okay. I would just like to note that if Movant's arguments are accepted, then a subpoena could only be issued once there's proof of a violation, which seems circular. This is an investigation, and --

THE COURT: Well, I mean, when I'm on criminal duty, I authorize search warrants all the time, right, when there's an investigation underway, right, without required -- and that does require probable cause, right. We don't require ultimate proof beyond a reasonable doubt of a criminal offense having been committed, right, and that's what the Stored Communications Act calls for, isn't it?

(No audible response.)

THE COURT: I mean, there is a mechanism to get this information if a proper foundation can be shown, but not unusual for the Court to authorize such search warrants.

MS. BALKISSOON: In the cases that we cited in our

brief, the analysis -- the constitutional analysis there recognizes that administrative subpoenas should be treated differently just because -- because they're investigatory and they're not -- they're different from regulations or laws that are fixed and broad. These are targeted investigation -- targeted subpoenas that are investigatory. So, they shouldn't be held to the same standard as charging someone or a regulation would undergo that type of constitutional scrutiny.

THE COURT: I mean, you've served as a line prosecutor, right?

(No response.)

THE COURT: Haven't you?

MS. BALKISSOON: I have not.

THE COURT: Okay. You've worked with line prosecutors, right?

MS. BALKISSOON: Yes.

THE COURT: They submit applications for search warrants all the time that are investigatory for criminal matters. I don't understand the distinction you're trying to draw between investigatory and administrative subpoenas and criminal search warrants that are also investigatory. They're all investigatory.

Is there -- is there really a legal distinction there?

MS. BALKISSOON: I mean, I think there is a

distinction between an investigatory administrative subpoena like the one issued here and a --

THE COURT: But it's one that's issued to enforce a criminal statute, right?

MS. BALKISSOON: To investigate a violation of the criminal --

THE COURT: Okay.

MS. BALKISSOON: -- a criminal statute.

THE COURT: So, an AUSA submits an application for a search warrant to investigate, you know, 18 U.S.C., whatever the statutes that cover, you know, distribution of methamphetamine. You're investigating it, right? I mean, tell me why should I -- why should the courts treat those differently as between administrative subpoenas to support an investigation into a criminal offense?

MS. BALKISSOON: My point was really about the cases that we had cites that are about enforcing regulations and about charging individuals, the treatment of that type of government action versus this type of administrative subpoena.

THE COURT: Okay. All right. Sorry. I didn't mean to interrupt you. You were winding up. Anything else?

(Pause.)

MS. BALKISSOON: No, your Honor. Thank you.

THE COURT: Okay. Mr. Loney, last word.

MR. LONEY: Sure. I just want to sort of make what may be implicit here explicit, which is trying to do what DHS is trying to do under an administrative subpoena and reading their arguments and hearing their arguments kind of highlights the problem with trying to pull this elephant out of this particular mouse hole, which is it seems that DHS's perception is that the bar they have to meet is lower to get information under an administrative subpoena via 1509.

And, so, that only highlights the problem with trying to expand the scope of 1509 to do what the Government couldn't otherwise do based on the bare bones allegations they have, which is get a valid subpoena or a warrant to investigate a supposed violation of Section 115.

As your Honor is alluding to, based on this information that is before the Court today, there is -- and, as counsel is alluding to too, there would be a higher bar to get a warrant than this. And, so, the fact that they're saying but this is enough for a 1509 summons, it doesn't actually make us sleep any easier.

Also, we haven't talked a lot about the First Amendment, and we can rely on our briefs for that, but I do want to conclude with a quote from a First Amendment case, McIntyre, which is the foundational anonymous speech case, and there the Supreme Court said:

"The purpose behind the Bill of Rights and of the First Amendment in particular is to protect unpopular individuals from retaliation and their ideas from suppression."

That protection is exactly what we're asking the Court to apply here.

THE COURT: Okay. Submitted?

MS. BALKISSOON: Can I have one more say, your Honor?

THE COURT: Sure.

MS. BALKISSOON: Under Movant's -- Movant's argument, he's hoping to limit this provision to some subpoena power. So, there is -- this is an -- there is a mechanism even under your interpretation of the statute to obtain subpoenas in investigations in, you know, sex trafficking or child exploitation cases. So, there is a mechanism here that is distinct from a criminal investigation obtaining a search warrant.

So, this -- just because they could also obtain a search warrant doesn't mean that this power shouldn't also exist. And I -- the last thing I would say is just that Respondent is only advocating for the plain text of the statute which does not contain this limitation.

Thank you.

THE COURT: Last work.

MR. LONEY: It sure does.

THE COURT: All right. Submitted now?

MS. BALKISSOON: Yes.

THE COURT: Submitted?

MR. LONEY: Yes, your Honor. Thank you.

THE COURT: All right. Thank you for your -- your extensive arguments and preparation for today. I assume there's no particular rush on issuing an order on this. There's no deadline to be aware of?

MR. LONEY: As long as there isn't some push to get Meta to provide the information while we're awaiting word that we're not aware of, then we're in no particular rush.

THE COURT: Well, I'm sure nobody's going to be in contempt of my order staying the -- the summons.

MR. LONEY: That's what I should have said is assuming your Honor's prior order stays in place, then we're in no rush.

THE COURT: Counsel, you or somebody will bring to my attention probably if there is a threatened or actual violation of one of my orders, correct?

MR. LONEY: Yes, your Honor.

THE COURT: Okay. With that, I want to thank you both. Thank you for your argument.

MR. LONEY: Thank you, your Honor.

MS. BALKISSOON: Thank you.

THE CLERK: We're off the record in this matter. Court's in recess.

(Proceedings adjourned at 3:12 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, January 22, 2026